# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 6, 2006                Decided April 3, 2007

No. 05-1161

LOUISIANA PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ENTERGY SERVICES, INC., ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*Michael R. Fontham* argued the cause for petitioner. With him on the briefs were *Paul L. Zimmering* and *Noel J. Darce*.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Monique L. Watson*, Attorney.

*Mary W. Cochran* argued the cause for intervenors Arkansas Public Service Commission, et al. With her on the brief were *Paul R. Hightower*, *Clinton A. Vince*, *J. Cathy Fogel*, *Paul E. Nordstrom*, *George M. Fleming*, *William S. Scherman*,

*J. Wayne Anderson*, and *Gregory W. Camet.*

Before: GINSBURG, *Chief Judge*, and ROGERS and KAVANAUGH[*], *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*:  The Louisiana Public Service Commission (Louisiana) petitions for review of an order of the Federal Energy Regulatory Commission (1) permitting Entergy Corporation to phase interruptible load out of its calculation of peak load, which it uses to equalize capacity costs for its Operating Company subsidiaries; (2) refusing to order those Operating Companies that benefitted from inclusion of interruptible load in the calculation to make payments, pursuant to § 206 of the Federal Power Act, to those Operating Companies that were burdened by such inclusion; and (3) refusing to determine in this proceeding whether Entergy should have included the opportunity cost of allowances for emissions of sulfur dioxide ($SO_2$) in its calculation of each Operating Company's peak load responsibility.

## I.  Background

Entergy is a public utility holding company with five subsidiary operating companies[**] that generate and sell electricity in Arkansas, Louisiana, Mississippi, and Texas.  *La.*

---

[*] Circuit Judge Kavanaugh, who was a member of the panel at the time the case was argued, recused himself from the case after oral argument.

[**] Entergy Arkansas, Inc., Entergy Gulf States, Inc., Entergy Louisiana, Inc., Entergy Mississippi, Inc., and Entergy New Orleans, Inc.

*Pub. Serv. Comm'n v. Entergy Corp.*, 106 F.E.R.C. ¶ 61,228 at 61,793 P 2 n.1 (2004) (Opinion No. 468). In 1982 each Operating Company entered into a contract (the System Agreement) with another subsidiary, now called Entergy Services, Inc., which agreement allocates capacity costs among them. *Id.* Pursuant to the System Agreement, each Operating Company was liable to make an "equalization payment" each month, depending upon the amount of electricity it took at the time of peak monthly demand on the Entergy system. *Id.* at 61,793-94 PP 2-3. If at the monthly peak an Operating Company took more power than it generated, then it was "short" and had to pay the companies that were "long." *Id.* The calculation of peak load was based upon a rolling average of the 12 previous monthly peak loads.

    A.   Interruptible Load in the Calculation of Peak Load Responsibility

Under § 201(b) of the Act, the Commission has jurisdiction to approve rates, terms, and conditions for wholesale electricity service offered in interstate commerce, *see* 16 U.S.C. § 824(b) (2004), which includes the electricity sold by the Operating Companies. The Commission may review and order a change in any rate it finds is "unjust, unreasonable, unduly discriminatory or preferential." § 206(a), 16 U.S.C. § 824e(a) (2004).

Some of the Operating Companies carry an "interruptible load" in addition to a "firm load." Firm load is electricity sold pursuant to a contract that entitles the customer to receive service from the seller on demand. Interruptible load, on the other hand, is electricity sold pursuant to a contract that entitles the seller to curtail service when it does not have enough capacity to produce electricity in excess of the quantity demanded by customers with contracts for firm service.

Louisiana regulates the retail rates charged by utilities operating in Louisiana, where most of Entergy's retail customers with contracts for interruptible service are located.

In 1995 Louisiana filed a complaint with the Commission claiming the formula for peak load responsibility in Entergy's System Agreement was unjust or unreasonable because it allocated capacity costs to the Operating Companies based upon monthly peak demand for both firm and interruptible load. The Commission, whose trial staff estimated that removing interruptible load from the formula Entergy used to calculate peak load responsibility would shift $ 14 million in cost responsibility from Entergy Louisiana's ratepayers to the ratepayers served by the other Operating Companies, rejected Louisiana's complaint. *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 76 F.E.R.C. ¶ 61,168 at 61,956 (1996), *reh'g denied*, 80 F.E.R.C. ¶ 61,282 at 62,007 (1997). The Commission also determined Louisiana was not entitled to a hearing because it had not alleged that Entergy's decision no longer to count interruptible load when deciding whether to add new capacity had upset the "rough" "equalization" of costs among the Operating Companies achieved by the System Agreement. *Louisiana Commission*, 80 F.E.R.C. ¶ 61,282 at 62,007.

We granted Louisiana's petition for review and held the Commission did not give an adequate explanation for departing from the precedent it had set in *Kentucky Utilities Co.*, 15 F.E.R.C. ¶ 61,002 at 61,004-05 (1981), where the Commission held it was unjust or unreasonable for a utility to charge capacity costs to a customer purchasing only interruptible service because the utility could control its capacity costs by curtailing interruptible service during times of peak demand. *See La. Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 896-97 (1999) (*Louisiana I*). We remanded the case for the Commission to

determine whether including interruptible load in the formula for allocating peak load responsibility was unjust or unreasonable and, if not, then to explain its reasoning in light of *Kentucky Utilities*. *See id.* at 897, 900. Because we could not "discern the content of its 'rough equalization' standard," we also directed the Commission to clarify the standard and "either reveal why [Louisiana's] allegation of an unjust and unreasonable method of allocation with facially significant consequences does not meet that standard, or grant [Louisiana] a hearing, as the case may be." *Id.* at 899.

Nearly five years later, in March 2004, the Commission determined it was unjust or unreasonable for Entergy to include interruptible load in its calculation of peak load responsibility because the Operating Companies could control capacity costs by curtailing interruptible service during times of peak demand. *Louisiana Commission*, 106 F.E.R.C. ¶ 61,228 at 61,802-04 PP 67-77 (Opinion No. 468). Entergy moved for rehearing, arguing it should not have to remove interruptible load from its calculation of peak load for the 12 months preceding April 2004 so that "the effect of Opinion No. 468 will be phased in prospectively over the ensuing twelve months." In April 2005 the Commission answered, rather cryptically: "Entergy must adjust the system peaks and its rates beginning April 1, 2004, as required by Opinion No. 468." *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 111 F.E.R.C. ¶ 61,080 at 61,372 P 31 (2005) (Opinion No. 468-A). Later that month, at a hearing before the Louisiana Public Service Commission, counsel for Entergy Services, Inc. took the position that the Opinion No. 468-A "was saying that you begin the rolling 12 months in April of '04, so that, by the time you get to April of '05, you'll have the effect"; in other words, Entergy interpreted Opinion No. 468-A as adopting its request to phase the interruptible load out of its formula for peak load responsibility over a period of 12 months.

In June 2005 Louisiana filed a protest with the Commission. In a Compliance Order issued that August, however, the Commission expressly accepted Entergy's phase-out approach as the "natural result of the billing lag built into the formula rate." *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 112 F.E.R.C. ¶ 62,192 at 62,014 P 13 (2005). Louisiana now seeks review of Opinion Nos. 468 and 468-A, so interpreted.

B. Refunds for Cost of Interruptible Load

Entergy continued to include interruptible load in its calculation and allocation of peak load responsibility after Louisiana had filed its complaint in March 1995. Louisiana contends the Commission may and should, pursuant to § 206(b) of the Act, 16 U.S.C. § 824e(b), order the Operating Companies that were benefitted by the inclusion of interruptible load in the calculation to pay the Operating Companies that were burdened the amount each would have paid if interruptible load had not been included for the 15-month period following the "refund effective date." That section of the Act authorizes the Commission to order a public utility that has charged customers an unjust or unreasonable rate:

> to make refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate ... which the Commission orders to be thereafter observed and in force.

Section 206(c), however, specifically prohibits the Commission from ordering one subsidiary of a holding company to refund monies to a sister subsidiary unless the Commission determines the holding company will not experience any reduction of revenue because of the payor subsidiary's "inability ... to

recover such increase in costs" from its ratepayers.[*]

After this court held in *Louisiana I* that the Commission had not adequately explained its decision permitting Entergy to include interruptible load in its calculation of peak load, the Commission established May 14, 1995 as the refund effective date. *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 93 F.E.R.C. ¶ 61,013 at 61,027 (2000). In Opinion Nos. 468 and 468-A, however, the Commission determined it could not order refunds because it could not find, as required by § 206(c), that the Operating Companies would be able to recover the refunded amounts from their retail customers. *Louisiana Commission*, 106 F.E.R.C. ¶ 61,228 at 61,805-06 PP 82-89 (Opinion No. 468), *reh'g denied*, 111 F.E.R.C. ¶ 61,080 at 61,370 PP 21-22 (Opinion No. 468-A). In response to Louisiana's contention that

---

[*]     Section 206(c), 16 U.S.C. § 824e(c) says:

> Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that ... (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order.

a refund ordered by the Commission would preempt inconsistent state retail rates, the Commission observed that it lacked jurisdiction "to directly prescribe retail rates." *Louisiana Commission*, 111 F.E.R.C. ¶ 61,080 at 61,370 P 22 (Opinion No. 468-A). The Commission also rejected as being without probative value testimony proffered by Louisiana asserting that the payor subsidiaries could pass the cost of refunds on to their retail customers in the same manner as they pass on equalization payments under the System Agreement. *Louisiana Commission*, 106 F.E.R.C. ¶ 61,228 at 61,805-06 PP 85-89 (Opinion No. 468). Louisiana also seeks review of Order Nos. 468 and 468-A with respect to this question of Commission authority.

C.   Opportunity Cost of Allowances for Emissions of $SO_2$

The Congress enacted the Acid Deposition Control portion of the Clean Air Act Amendments of 1990 in order to reduce the emission of atmospheric pollutants that contribute to acid rain. *See* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, tit. IV, 104 Stat. 2399, 2584-631 (codified at 42 U.S.C. §§ 7651-7651o). The Amendments capped annual emissions of $SO_2$ and established a system for the purchase and sale of "allowances," each of which is essentially a permit to emit one ton of $SO_2$. *Id.* tit. IV, § 402(3) (codified at 42 U.S.C. § 7651a(3)).

In 1999 Entergy filed with the Commission a proposed amendment to the System Agreement designed to "ensure[] that each Entergy Operating Company will be compensated for any sulfur dioxide emission allowances used to generate energy exchanged among the Operating Companies." *See Entergy Services, Inc.*, 89 F.E.R.C. ¶ 61,331 at 62,004 (1999). Because of the effect this so-called $SO_2$ Amendment would have upon the allocation of costs among the Operating Companies, Louisiana intervened in opposition, arguing the amendment was unjust or unreasonable insofar as it disrupted the "rough equalization" of

costs among the Operating Companies provided in the System Agreement. *See id.* at 62,004-05. The Commission accepted the amendment "subject to refund" and subject to the Commission's determination, pursuant to our remand order in *Louisiana I*, whether the inclusion of interruptible load in the calculation of peak load was consistent with the same "rough equalization" requirement (Docket No. EL95-33-000). *Id.* at 62,005. In later filings in that proceeding, Louisiana argued the Commission should reject the $SO_2$ Amendment as inconsistent not only with the Entergy System Agreement but also with a 1993 agreement between Entergy and its retail regulators, presumably including Louisiana.

In 2004 the Commission concluded that the reasonableness of the $SO_2$ Amendment was not properly before it in the aforementioned docket; pursuant to an agreement approved by the Commission in 2001, the parties (including Louisiana) had settled a number of issues with respect to the allocation of costs under the System Agreement, and the Commission concluded that the "$SO_2$ amendment issue and all other issues related to the rough equalization of costs among the Operating Companies" had been moved to another docket (No. EL01-88-000). *Louisiana Commission*, 106 F.E.R.C. ¶ 61,228 at 61,807 PP 96-99 (Opinion No. 468). In particular, the parties agreed not to submit in this docket the question whether, in order "[t]o amend the System Agreement to reflect the cost of emission allowances," Entergy first should be "required to show that the 'rough equalization' of costs among the Operating Companies [had] been upset." Though the Commission overlooked it in Opinion No. 468, the parties contemplated that the question whether the "amendment to add the replacement cost of $SO_2$ allowances to costs billed under MSS-3 in the System Agreement [is] just and reasonable and consistent with the [Act]" would remain pending in this docket (No. EL95-33-002).

Upon Louisiana's petition for rehearing, which called attention to the Commission's oversight, the Commission decided it would not be appropriate after all to resolve that issue in that docket (No. EL01-88-000) because the issues raised in that docket had already been briefed, tried, and resolved by the Administrative Law Judge (ALJ), *see La. Pub. Serv. Comm'n v. Entergy Servs.*, 106 F.E.R.C. ¶ 63,012 (2004). *See Louisiana Commission*, 111 F.E.R.C. ¶ 61,080 at 61,371 P 26 (Opinion No. 468-A). The Commission also held, however, that Louisiana's challenge to the $SO_2$ Amendment was untimely, having been raised only when Louisiana had excepted to the ALJ's initial decision in the case involving the calculation of peak load and the issue of refunds (Docket Nos. EL00-66-000 & EL95-33-002), *see La. Pub. Serv. Comm'n v. Entergy Corp.*, 96 F.E.R.C. ¶ 63,002 (2001); therefore the Commission determined Louisiana could pursue the $SO_2$ Amendment issue in "the next case Entergy files regarding the System Agreement, or ... a complaint" initiating a new proceeding. *Louisiana Commission*, 111 F.E.R.C. ¶ 61,080 at 61,371 P 26 (Opinion No. 468-A). Louisiana petitions the court for review of this procedural decision, arguing the Commission must determine whether the $SO_2$ Amendment is proper without Louisiana having to file a new complaint.

## II. Analysis

We will set aside a decision of the Commission only if it is "arbitrary and capricious or otherwise contrary to law." *Envtl. Action, Inc. v. FERC*, 939 F.2d 1057, 1061 (D.C. Cir. 1991). Before considering the merits of Louisiana's petition, however, we must dispose of the jurisdictional objections to our review.

### A. Jurisdiction

The Commission and the Intervenors argue the court may

not entertain Louisiana's challenge to the Commission's decision permitting Entergy to phase interruptible load out of its calculation of peak load because Louisiana did not first ask the Commission to rehear that issue. Under § 313(b) of the Act, 16 U.S.C. § 825l(b), the court may not consider an objection to an order of the Commission "unless such objection shall have been urged before the Commission in [an] application for rehearing [or] there is reasonable ground for failure so to do." Satisfaction of § 313(b) is a "jurisdictional prerequisite to judicial review," *Pub. Serv. Comm'n of the State of N.Y. v. FPC*, 543 F.2d 757, 774 n.116 (D.C. Cir. 1974).

Louisiana claims as its "reasonable ground" that it had no reason to seek rehearing of the Commission's decision requiring Entergy to remove interruptible load from its calculation of peak load until the Commission issued the Compliance Order, at which time the deadline for filing a rehearing petition had passed. We agree. According to both the Compliance Order and the Commission's argument on review, Opinion Nos. 468 and 468-A call for Entergy to phase interruptible load out of its calculation of peak load over a 12-month period; the Compliance Order merely interprets the Opinions to that effect. This is far from apparent on the face of the Opinions, however; indeed, they give no indication that Entergy's removal of interruptible load from its calculation is to be anything other than immediate. Louisiana could not be expected to seek rehearing of decisions that, on their faces, represented a complete victory for it. Only when the agency by interpretation made the victory less than complete — after the time for rehearing had passed — did Louisiana have reason to seek review. If review were unavailable in these circumstances, then an "agency [could] enter an ambiguous or obscure order, wilfully or otherwise, wait out the required time, then enter an 'explanatory' order that would extinguish the review rights of parties prejudicially affected." *Sam Rayburn Dam Elec. Coop.*

*v. FPC*, 515 F.2d 998, 1007 (D.C. Cir. 1975). As the cited case makes clear, the law of this circuit does not allow such a "perversion" of the "policy requiring timely filing of motions for reconsideration." *Id.*

The Commission also challenges Louisiana's standing to object to the Commission's decision to permit Entergy to phase interruptible load out of its calculation of peak load on the ground that, because the proceeding that was the subject of the Compliance Order is still ongoing, Louisiana has not suffered an immediate or concrete injury. The Compliance Order, however, authorized Entergy to phase the interruptible load out of its calculation of peak load and that is in fact what Entergy did, as the result of which Louisiana clearly sustained an immediate and concrete injury.[*] Therefore, we hold Louisiana has standing to challenge the inclusion of interruptible load in Entergy's calculation and allocation of peak load responsibility, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and we turn to the merits of its case.

B.   Phasing Out Interruptible Load

Louisiana argues the Commission acted arbitrarily and capriciously by allowing Entergy to phase interruptible load out of its calculation of peak load over the course of a year. The gist of its argument is simply that the Commission, having held a rate unjust or unreasonable and approved a new rate in place thereof, may not carry forward the effect of the disapproved rate, any more than it could simply leave the unjust or unreasonable

---

[*]   At oral argument, counsel for the Commission made clear that it awaited in the compliance proceeding only Entergy's submission of calculations and work papers showing precisely how it phased the interruptible load out of its calculation of peak load, a step in no wise material to the injury claimed, which goes to phasing-out in any form.

rate in place. *See Pub. Util. Comm'n of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) ("the formula itself is the rate, not the particular components of the formula" (quoting *Ocean State Power II*, 69 F.E.R.C. ¶ 61,146 at 61,544 (1992)).

The Commission contends the phase-in of the new rate was the "natural result of the billing lag built into the formula rate." *Louisiana Commission*, 112 F.E.R.C. ¶ 61,192 at 62,014 P 13. The Commission's point appears to be that the System Agreement called for a "cost of service" rate, which required that costs incurred in one month be recovered in a later month, thus necessarily creating a billing lag for the intervening months. *See Pub. Serv. Co. of N.H. v. FERC*, 600 F.2d 944, 948 (D.C. Cir. 1979). Louisiana, on the other hand, argues the System Agreement provided a "fixed rate" formula, which used data from a past period as a proxy for current costs. *See id.* at 948, 950-52.

The Commission errs insofar as it suggests the lingering inclusion of interruptible load in the calculation of peak load was justified on the ground that it properly recovered an actual cost incurred in the provision of service. The cost of providing interruptible service is, by definition, avoidable and therefore — as the Commission has held, *see Kentucky Utilities*, 15 F.E.R.C. ¶ 61,002 at 61,004 — not an expense that justifies an increase in capacity, and therefore not the type of expense for which one Operating Company may recover from others under the Entergy System Agreement, *Louisiana Commission*, 106 F.E.R.C. ¶ 61,228 at 61,802-04 PP 63-77 (Opinion No. 468). This is so regardless whether including interruptible load in Entergy's calculation of peak load enabled it to recover actual costs via deferred billing or served as a proxy for actual costs in a fixed rate formula. On either view, the Commission has not explained why Entergy may continue to bill for costs the Commission has determined may not be justly and reasonably recovered. We

hold, therefore, the Commission acted arbitrarily and capriciously by allowing Entergy to phase interruptible load out of its calculation of peak load for the purpose of allocating costs among the Operating Companies after the Commission had determined inclusion of interruptible load in the determination of peak load responsibility was unreasonable and therefore unlawful.

## C. Refunds

As we have seen, Louisiana asked the Commission to order the Operating Companies that benefitted to make refunds to the Operating Companies that were burdened by Entergy's inclusion of interruptible load in its calculation of peak load. The Commission declined on the ground that, because it could not be certain the Operating Companies owing refunds would be allowed by their state regulators to recover at retail the revenue needed to pay the refunds, it could not find, as required under § 206(c), that Entergy "would not experience any reduction in revenues" as a result. *See Louisiana Commission*, 111 F.E.R.C. ¶ 61,080 at 61,370 PP 21-22 (Opinion No. 468-A).

Louisiana maintains that an order of the Commission requiring an Operating Company to make refunds would preempt state retail ratemaking in the same way that an order of the Commission requiring a change in rates it finds are unjust or unreasonable preempts inconsistent state ratemaking. *See Miss. Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 373 (1988) (holding state retail ratemaking preempted *pro tanto* by Commission order approving allocation of costs of a new facility among subsidiaries of a holding company); *see also Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 966 (1986) ("State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable").

The Commission responds that, because its jurisdiction is limited to setting wholesale rates, it lacks authority to require a state public utility commission to permit an Operating Company owing refunds to collect from retail customers the revenue necessary to pay those refunds. *See Louisiana Commission*, 111 F.E.R.C. ¶ 61,080 at 61,370 PP 21-22 (Opinion No. 468-A). Further to that point, the Commission maintains Louisiana provided insufficient evidence that the concerned state commissions would permit the Operating Companies owing refunds to recover the costs thereof from retail customers. At oral argument, counsel for the Commission elaborated that a state commission might not permit a utility to pass the cost of refunds through to retail customers because the retroactive nature of a refund would conflict with the state's filed rate doctrine, which allows only prospective recovery of costs. *See, e.g.*, *Cullum v. Seagull Mid-South, Inc.*, 907 S.W.2d 741, 744-45 (Ark. 1995) (adopting filed rate doctrine, which "forbids a regulated entity from charging rates for its services other than those properly filed with the [Arkansas PSC]" (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 954 F.2d 485, 488 (8th Cir. 1992)). Louisiana, on the other hand, argues that when the Commission orders the payment of a refund, the filed rate for the refund-effective period is changed by the refund order.

The Congress added subsections (b) and (c) to § 206 of the Act, authorizing the Commission to order a refund when the Commission finds an approved rate has become unjust or unreasonable, in 1988. Regulatory Fairness Act, Pub. L. No. 100-473 § 2, 102 Stat. at 2299-300.[*] The Commission points to

---

[*] The Intervenors point out that the Congress acted after the Supreme Court had made clear in *Nantahala* (1986) and in *Mississippi Power* (1988) that the states are required by the Supremacy Clause to allow a utility to pass through to customers a rate increase ordered by the Commission. Because the Congress is presumed to know how the

a Report of the Senate Committee on Energy and Natural Resources, S. Rep. No. 100-491 at 6-7, *as reprinted in* 1988 U.S.C.C.A.N. 2684, 2688-89, stating that the Regulatory Fairness Act would amend § 206(c) to address the Congress's concern that the cost of Commission-ordered refunds — as opposed, presumably, to a change in rates mandated by the Commission — would be "trapped" on the books of the paying subsidiary if the state utility commission prevented the utility from recovering that cost from its retail customers. In particular, the Committee feared the state utility commissions would invoke the filed rate doctrine to prevent the pass through.

This is all very interesting but, as Louisiana notes, the Commission fails to explain why the requirements of the filed rate doctrine would not be satisfied with respect to the refunds here at issue considering that all parties were on notice as of the filing of Louisiana's complaint in 1995 that Entergy's calculation of peak load responsibility might be held unjust or unreasonable. *Cf. Canadian Ass'n of Petroleum Producers v.*

---

courts have interpreted extant law when it enacts a new law, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988), the Intervenors (alone) argue the requirement of a finding under § 206(c) — that the holding company will not experience a reduction in revenue from the inability of a subsidiary to recover the cost of refunds — would be superfluous if the states already had to permit those costs to be passed through to retail customers.

We may in our discretion "entertain arguments raised only by an intervenor on review if they have been fully litigated in the agency proceedings and [are] potentially determinative of the outcome of judicial review." *Nat'l Ass'n of Regulatory Util. Comm'rs v. ICC*, 41 F.3d 721, 729-30 (D.C. Cir. 1994) (internal quotation marks omitted). This rationale for why a Commission-ordered refund does not preempt inconsistent state ratemaking was not, however, offered, let alone vetted, before the Commission.

*FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("So long as the parties had adequate notice that surcharges might be imposed in the future, imposition of surcharges does not violate the filed rate doctrine"). In fact, the Commission itself has previously taken the position that a refund ordered pursuant to § 206(c) "would be ... 'prospective' from the refund date, rather than 'retroactive.'" *Blue Ridge Power Agency v. Appalachian Power Co.*, 57 F.E.R.C. ¶ 61,100 at 61,374 (1991). Nor has the Commission explained why, under the Supremacy Clause, a rate increase ordered by the Commission may be recovered through retail rates but a refund ordered by the Commission may not be. *Cf. Mississippi Power*, 487 U.S. at 369-72.

Commission counsel argues in the alternative that the Commission, even if it was in error about its authority to order refunds, merely exercised its discretion not to do so in this case. There is not even a hint of discretion being exercised, however, in the orders under review, and "courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Therefore, with respect to the Commission's determination that it could not make the finding necessary to order some of the Entergy Operating Companies to make refunds to other Entergy Operating Companies in order to compensate them for costs unjustly or unreasonably allocated to them, we shall grant the petition for review and remand the matter to the Commission for a more considered determination.

D.   Opportunity Cost of Allowances for Emissions of SO$_2$

Louisiana asks us to require the Commission — in the docket underlying this appeal — to pass upon Louisiana's claim that it is unjust or unreasonable for Entergy to allocate among the Operating Companies the opportunity cost some of them

incur by using rather than selling their allowances to emit $SO_2$. Louisiana argues the Commission has shuffled that issue back and forth among various dockets in order to avoid addressing it. We afford the Commission "broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures." *Mobil Oil Exploration & Producing S.E., Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230 (1991). The agency abuses that discretion only when its manner of proceeding significantly prejudices a party or unreasonably delays a resolution. *GTE Serv. Corp. v. FCC*, 782 F.2d 263, 274 (D.C. Cir. 1986).

Louisiana argues for the first time in its reply brief that it "might" be prejudiced by the potential inability of the Entergy Louisiana Operating Company to recover the costs allocated to it under the $SO_2$ Amendment, which the Commission approved subject to refund. *See Entergy Services*, 89 F.E.R.C. ¶ 61,331 at 62,005. Specifically, Louisiana states, without explanation, "In a future case that refund condition might not carry over." This argument — if it is an argument and not just the speculation it seems to be — is forfeit because Louisiana did not raise it earlier. *Grant v. U.S. Air Force*, 197 F.3d 539, 542 n.6 (D.C. Cir. 1999) ("our caselaw makes clear that an argument first made in a reply comes too late"). Therefore, we shall not disturb the Commission's decision to defer consideration of the $SO_2$ issue to "the next case Entergy files regarding the System Agreement, or ... a complaint raising this issue." *Louisiana Commission*, 111 F.E.R.C. ¶ 61,080 at 61,371 P 26 (Opinion No. 468-A).

## III. Conclusion

We grant the petition for review insofar as the Commission, having determined that inclusion of interruptible load in the formula for allocating peak load responsibility was

unreasonable, acted arbitrarily and capriciously in allowing Entergy to phase that load out of its calculation. With respect to the Commission's refusal to order refunds of costs unjustly or unreasonably allocated to certain Operating Companies due to such inclusion, we grant the petition and remand the matter to the Commission for further proceedings consistent with Part II.C. of this opinion. Finally, with respect to the Commission's decision to defer consideration of the sulfur dioxide issue, we deny the petition; the Commission acted within its broad discretion to manage the matters before it and Louisiana failed to show any cognizable prejudice therefrom.

*So ordered.*