# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 2, 2007        Decided April 15, 2008

No. 05-1462

LOUISIANA PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ARKANSAS PUBLIC SERVICE COMMISSION, ET AL.,
INTERVENORS

———

Consolidated with
06-1054, 06-1057

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*John Longstreth* argued the cause for petitioner Arkansas Electric Energy Consumers, Inc. On the briefs were *Brian C. Donahue* and *Stacy M. Hazell*. *Donald A. Kaplan* entered an appearance.

*Michael R. Fontham* argued the cause for petitioner Louisiana Public Service Commission. With him on the briefs were *Paul L. Zimmering* and *Noel J. Darce*.

*Mary W. Cochran* argued the cause for petitioners Arkansas Public Service Commission and Mississippi Public Service Commission. With her on the briefs were *Paul Randolph Hightower*, *Ted J. Thomas*, and *George M. Fleming*.

*Lona T. Perry*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was *Robert H. Solomon*, Solicitor.

*J. Wayne Anderson* argued the cause for intervenor Entergy Services, Inc. With him on the brief was *William S. Scherman*.

*Mary W. Cochran*, *Paul Randolph Hightower*, *Ted Thomas*, *Clinton A. Vince*, *J. Cathy Fogel*, *Paul E. Nordstrom*, *George M. Fleming*, *Brandon J. Harrison*, *Andy Adams*, *Brian C. Donahue*, and *Stacy M. Hazell* were on the brief for intervenors Arkansas Public Service Commission, et al. in support of respondent. *Donald A. Kaplan*, *John Longstreth*, and *Emma F. Hand* entered appearances.

*Earle H. O'Donnell*, *Zori G. Ferkin*, *Daniel A. Hagan*, *Michael R. Fontham*, *Paul L. Zimmering*, and *Noel J. Darce* were on the brief for intervenors Louisiana Public Service Commission and Occidental Chemical Corporation.

Before: SENTELLE, *Chief Judge*, and GARLAND and GRIFFITH, *Circuit Judges*.

Opinion for the court filed PER CURIAM.

PER CURIAM: We consider three consolidated petitions for review of two orders of the Federal Energy Regulatory Commission ("FERC" or "the Commission"), *La. Pub. Serv. Comm'n v. Entergy Servs., Inc. et al.*, 111 F.E.R.C. ¶ 61,311 (2005) ("Opinion No. 480"), and *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 113 F.E.R.C. ¶ 61,282 (2005) ("Opinion No. 480-A"). In the orders under review, the Commission held that the production costs of the five operating companies in the Entergy power system must be "roughly equalized" in a +/- 11 percent bandwidth around System average each year. The Commission further found that production costs associated with the Vidalia hydropower plant in Vidalia, Louisiana should not be included in the +/- 11 percent bandwidth calculation. The Commission ordered that the remedy be implemented prospectively on January 1, 2006 without refunds due to any of the Entergy operating companies.

Petitioners contest the Commission's jurisdiction to order the bandwidth remedy, the rationality of its decision, the timing of the implementation of its remedy, and its denial of refunds. We conclude that the Commission had jurisdiction to reallocate production costs, that its +/- 11 percent bandwidth remedy was not arbitrary or capricious or contrary to law, and that its exclusion of the Vidalia hydropower plant was supported by substantial evidence. However, we grant the petition with respect to the Commission's decisions to deny refunds and to implement a prospective remedy commencing in 2007 based on 2006 data, and we remand the matter to the Commission for further proceedings on those issues consistent with Part V of this opinion.

## I. BACKGROUND

The dispute before us stems from disparities in production costs among the five operating companies in the Entergy System which have resulted from Entergy's system-wide approach to locating generation capacity, a spike in the price of natural gas, and a phased-in rate schedule associated with an inefficient hydropower plant near Vidalia, Louisiana.

### A. The Entergy System

#### 1. System-wide Planning Approach

Entergy Corporation is a public utility holding company that sells electricity, both wholesale and retail, in Arkansas, Louisiana, Mississippi, and Texas. It does so through five operating companies named after their respective jurisdictions: Entergy Arkansas, Inc., Entergy Louisiana, Inc., Entergy Mississippi, Inc., Entergy Gulf States, Inc., and Entergy New Orleans, Inc. The Entergy System has been highly integrated for over fifty years, with transactions within the System governed by a System Agreement. The current System Agreement was filed in 1982.

The System Agreement acts as an interconnection and pooling agreement for the energy generated in the System and provides for the joint planning, construction and operation of new generating capacity in the System. The System Agreement assigns the task of coordinating the addition of new generating capacity to a systemwide operating committee that is composed of a representative from Entergy Corporation and each of its operating companies. *Miss. Indus. v. FERC*, 808 F.2d 1525, 1529 (D.C. Cir. 1987). The operating committee makes "the major decisions concerning general timing, location and size of plant additions, in view of

the overall needs of the system, while accommodating individual company needs wherever possible." *Id.* at 1556 (internal quotations omitted).

In adding generating capacity, the committee follows both a system-planning approach, which ensures that "generation facilities are planned, constructed and operated for the benefit of the whole system," and a rotational approach, which adds new capacity on a rotating basis to the jurisdictions in the System. 111 F.E.R.C. at 61,351; 113 F.E.R.C. at 62,132. Because an operating company is responsible for the costs of the generation plants in its jurisdiction, *id.*, the rotation of new plants throughout the System historically had the effect of roughly evening out investment costs over time among the operating companies, *Miss. Indus.*, 808 F.2d at 1531.

Within this scheme, in the 1950s and 1960s, the operating committee tended to add new generating units in Louisiana to take advantage of its inexpensive oil and gas reserves. *Id.* In the late 1960s and early 1970s, the operating committee decided to shift away from oil and gas generation and to add nuclear and coal capacity. *Id.* at 1556. A company's ability to construct oil- and gas-fired units generally depended on the existence of sufficient natural resources within its service area, while the ability to build coal and nuclear units was less restricted. *Id.* at 1555. In accordance with the rotational scheme of asset additions, much of the coal capacity was constructed in Arkansas. 111 F.E.R.C. at 62,352. As before, production costs among the operating companies remained "roughly equal." 113 F.E.R.C. at 62,133.

The investment in nuclear generation, on the other hand, proved prohibitively expensive and catastrophically

uneconomical. *Miss. Indus.*, 808 F.2d at 1531–32. The Grand Gulf nuclear plant in Port Gibson, Mississippi, for example, was initially projected to cost $1.2 billion for two generating units, but ended up costing more than $3 billion for one unit. *Id.* at 1531. After it became apparent that Entergy Mississippi, then named Mississippi Power & Light, could not bear the cost of the Grand Gulf facility, the System formed a generating subsidiary to finance and run the Grand Gulf plant. *Id.* at 1533. The costs of Grand Gulf were allocated to the operating companies through an addendum to the 1982 System Agreement. *Id.* at 1554.

The Commission considered the proposed allocation of nuclear investment costs in proceedings initiated by the System in 1982. *Id.* at 1534. The Commission found that the System Agreement requires that production costs be "roughly equal" among the operating companies. 111 F.E.R.C. at 62,351. It further found that the "great disparities in installed nuclear investment costs disrupted the rough equalization of production costs that had existed on the system and thereby produced undue discrimination" in violation of Section 206 of the Federal Power Act. *Id.* The Commission concluded that equalizing responsibility for the nuclear investment costs among the operating companies would remedy the undue discrimination. *Id.*; *Miss. Indus.*, 808 F.2d at 1553. On petition for review, this Court agreed that the System Agreement showed an intent to roughly equalize capacity costs among the operating companies, *id.* at 1554–55, that the Commission "could properly conclude that the tremendous disparities in nuclear capacity costs among the operating companies disrupt[ed] the System's historical pattern of roughly equalizing capacity costs," *id.* at 1557, and that the Commission's choice to order nuclear investment equalization to remedy the problem was both rational and within its discretion, *id.* at 1565.

## 2. The Rising Cost of Natural Gas and its Effect on the Entergy System

After implementation of the nuclear investment remedy, rough production cost equalization was "maintained from 1986–1999, with variations from year-to-year, but without any long-term large bias for any one company or another." 111 F.E.R.C. at 62,352. During the three years prior to the nuclear investment remedy, the production costs of the Entergy operating companies had deviated from System average by 35.15, 25.32, and 32.9 percent. *Id.* at 62,355. During the fourteen years after the nuclear investment remedy, the deviations on the System moderated, ranging from a low of 7.71 percent in 1995 to a high of 22.2 percent in 1987. *Id.*

The picture changed in 2000 when there was a spike in the price of natural gas. 111 F.E.R.C. at 62,352. The increase "had a dramatically disproportionate effect on [Entergy Louisiana]'s relatively large amount of gas-fired generation, as compared to [Entergy Arkansas]'s relatively large amount of cheaper coal base load capacity." *Id.* In 2000, Entergy Louisiana had production costs that were 12 percent above System average, while Entergy Arkansas's costs were 17 percent below average. *La. Pub. Serv. Comm'n v. Entergy Servs., Inc., et al.*, 106 F.E.R.C. ¶ 63,012, 65,110 (2004) ("Initial Decision"). Similarly, in 2001, when Entergy Louisiana had costs that were 10 percent above average, Entergy Arkansas's costs were 14 percent below, and in 2002, when Entergy Louisiana's were 11 percent above average, Entergy Arkansas's costs were 15 percent below. *Id.* The total deviations of all of the operating companies around System average accordingly rose, with deviations of 33.26 percent in

2000, 39.79 percent in 2001, and 27.6 percent in 2002. 111 F.E.R.C. at 62,355.

### 3.  *The Vidalia Hydropower Plant*

In addition to the high cost of gas, Entergy Louisiana was also bearing the escalating costs associated with the Vidalia Hydroelectric Power Plant built forty miles south of Vidalia, Louisiana. The plant was developed in the mid-1980s to harness the power of overflow water from the Mississippi and Red Rivers as it is diverted into the Atchafalaya River through a series of channels built by the Army Corps of Engineers. 106 F.E.R.C. at 65,115. The plant was constructed with six bulb turbines and a total peak capacity of 192 megawatts. *Id.* But, as a "run-of-the-river hydroelectric project," it depends on the flow of the rivers and has generally produced a smaller capacity of about 84 megawatts. *Id.* at 65,115–16.

The vast majority of the capacity from Vidalia is used by Entergy Louisiana pursuant to a long-term contract that its predecessor — Louisiana Power & Light — entered into in 1985 in which it agreed to purchase up to 94 percent of the output of the Vidalia plant. *Id.* at 65,116. The Louisiana Public Service Commission ("LPSC"), which then regulated Louisiana Power & Light and now regulates Entergy Louisiana, approved a phased-in rate schedule for the costs of the plant, which limited its costs to Entergy Louisiana initially, but then increased them until they leveled off at the end of the long-term contract. *Id.* at 65,117. As a result, during the early years of Vidalia's operation, the Vidalia energy cost $65/MWh, but by 2004 it cost $145/MWh and was scheduled to increase each year thereafter until it reaches a high of $205/MWh during the years 2010–2013. 111

F.E.R.C. at 62,374. The cost will then decrease each year until it levels off at $150/MWh for the years 2016–2031. *Id.*

## B. The Proceedings Below

### 1. *The ALJ's Initial Decision*

In June 2001, LPSC filed a complaint against Entergy with the FERC, asserting that the cost allocation among the Entergy operating companies had become unjust, unreasonable, and unduly discriminatory in violation of Sections 205 and 206 of the Federal Power Act, 16 U.S.C. §§ 824d(b), 824e(a). The case was assigned to presiding administrative law judge ("ALJ") Lawrence Brenner. The Arkansas Public Service Commission ("APSC"), which regulates Entergy Arkansas, and the Mississippi Public Service Commission ("MPSC"), which regulates Entergy Mississippi, disputed LPSC's claim. Based on an evidentiary record involving 6,218 transcript pages and over 390 exhibits, ALJ Brenner decided the following four issues which are pertinent to this petition.

*a. Disruption of Rough Equalization.* First, ALJ Brenner found that the cost allocations among the Entergy operating companies had become unduly discriminatory in violation of the Federal Power Act because the production costs among the companies were no longer "roughly equal." 106 F.E.R.C. at 65,109–10. He explained that, "[b]eginning with 2000, the increase in natural gas prices and the dependence of [Entergy Louisiana] on gas-fueled generation has caused its production costs to rise dramatically in relation to System average." *Id.* at 65,110. "[L]ooking at the history back to 1986, it is clear that prior to the current period beginning with 2000, there was no period where an Operating Company was hammered like [Entergy Louisiana] has been with double-digit percentage

deviations above System average for each of the past four years (2000–2003), while [Entergy Arkansas] has enjoyed greater than mirror image double-digit disparities below System average." *Id.* at 65,111. He further found that "2000, or even 2000–2003, cannot be chalked off as an aberrational temporary period," *id.* at 65,110, given price forecasts which left "no reasonable prospect of the situation self-correcting under the existing mechanisms of the System Agreement." *Id.* at 65,112.

*b. Bandwidth Remedy.* ALJ Brenner decided that a numerical bandwidth was the appropriate remedy to bring the Entergy System into "rough production cost equalization." 106 F.E.R.C. at 65,113. He thought "it appropriate to impose a limit measured over a rolling multi-year average" and to also "impose a higher annual limit to achieve some relief for the first year, to limit large swings in future individual years, and to start the multi-year rolling average towards smoother, achievable results." *Id.* To this end, he ordered a +/- 5 percent bandwidth to apply to a rolling three-year average and a +/- 7.5 percent bandwidth to apply annually. *Id.*

*c. Vidalia Hydropower Plant.* ALJ Brenner found that, when calculating production costs for the bandwidth remedy, the costs of the Vidalia hydropower plant should be included. *Id.* at 65,118. Entergy had argued that the plant was not a System resource, but was built "with an eye . . . towards satisfying the political and economic policy needs of the State of Louisiana, at the direction of the LPSC." *Id.* at 65,117. ALJ Brenner found that there was "sufficient evidence to conclude that Vidalia was planned as a resource for the benefit of the Entergy System" because "[a]fter Vidalia went into service, it provided energy that was ultimately used to serve the loads on the System." *Id.* at 65,118.

*d. Implementation of Remedy.* ALJ Brenner ordered that his +/- 7.5 percent annual remedy "be effective beginning with all of the previous calendar year of 2003," 106 F.E.R.C. at 65,113, so that "for each calendar year beginning with 2003, no Entergy Operating Company is more than +/-7.5% relative to System average," *id.* at 65,115.

## 2. FERC's Opinion No. 480

The interested parties filed exceptions to the ALJ's decision with the Commission. The Commission made the following four findings pertinent to this petition.

*a. Disruption of Rough Equalization.* The Commission agreed with ALJ Brenner that the Entergy System was no longer in rough production cost equalization. 111 F.E.R.C. at 62,350. It explained that "[w]hile history shows that production cost disparities have always existed, large disparities among the Operating Companies started to arise in 2000 and appear likely to continue into the future." *Id.* at 62,354. According to the Commission, "[t]he large and increasing disparities among the Operating Companies are now arising because the rotational scheme has been inactive for a lengthy period and rising gas prices have adversely impacted [Entergy Louisiana], which relies heavily on gas-fired production facilities." *Id.*

The Commission looked to historical data in determining whether rough production cost equalization had been disrupted. For the period from 1983 through 1985, prior to the nuclear investment equalization remedy, the total deviation of the operating companies from System average was about 31 percent. *Id.* After the Commission's remedy, the System "remained in rough production cost equalization for the next fourteen years, with total deviations ranging from 7.71 to

22.20 percent." *Id.* Deviations then "jumped significantly" to 33.26 in 2000, 39.79 in 2001, and 27.6 in 2002. *Id.* at 62,354–55. The Commission reasoned that because the 2000–2002 deviations are greater than those "which spurred the Commission to act in 1985," they required a finding that the System is not in a state of rough equalization. *Id.*

*b. Bandwidth Remedy.* The Commission agreed with ALJ Brenner that, "[w]ith actual gas prices remaining high and no indication that this is likely to change," a remedy was required to pull the System into rough production cost equalization. 111 F.E.R.C. at 62,357; *see id.* at 62,354–57. The Commission further agreed with the "use of a bandwidth as a remedial device," but reversed the ALJ's "determination on the appropriate bandwidth in favor of a broader bandwidth that eases the severity of the remedy's impact." *Id.* at 62,350. The Commission eliminated the three-year rolling average requirement in its entirety, finding it "overly complex, vague and unworkable," *id.* at 62,371, and ordered an annual bandwidth of +/- 11 percent, allowing for a maximum 22-percent spread in production costs between operating companies, *id.* at 62,372.

The Commission based its +/- 11 percent bandwidth on data from 1986–1999, the period following the nuclear investment equalization remedy, when the companies deviated from System average in amounts ranging from 7.71 percent to 22.2 percent. 111 F.E.R.C. at 62,371–72. Finding that the nuclear investment remedy created rough production cost equalization and recognizing that the highest total deviation during that period was 22.2 percent, the Commission reasoned that a 22 percent disparity in costs should be the highest deviation allowable in the System during a period of "rough production cost equalization." *Id.* at 62,372. A +/- 11 percent bandwidth would then apply if the

System exceeded historical cost disparities, but would otherwise allow the System to maintain the flexibility that it had traditionally enjoyed. *Id.*

   *c. Vidalia Hydropower Plant.* The Commission reversed the ALJ's finding that the Vidalia hydropower plant was a System resource based on four "distinguishing factors" about the Vidalia plant that it found established its status as a Louisiana-specific resource. *Id.* at 62,350, 62,376. First, FERC found that the Vidalia contract "was the product of a unique accommodation between the Louisiana Commission and [Entergy Louisiana] meant to facilitate the local economic and political objectives of Louisiana." *Id.* at 62,375. FERC pointed to the unusual structure of the contract, including the guaranteed flow through of the total power costs to Entergy Louisiana ratepayers by varying the fuel cost in monthly fuel adjustment charges, and the fact that no non-Louisiana retail regulator or other operating company was given the opportunity to determine whether the Vidalia contract was prudent. *Id.* at 62,376. Second, FERC noted that the costs of Vidalia, if included in the bandwidth calculation, would force operating companies other than Entergy Louisiana to bear the high costs of the plant, which would produce significant cost shifts among the operating companies and greatly impact retail rates. *Id.* at 62,377. Third, FERC pointed out that, in contrast to the System-wide strategy adopted by the committee when it decided to add nuclear generation to the System, "there is no evidence in this record that Vidalia was part of any centralized and deliberate plan to increase the use of hydroelectric power for the benefit of the system as a whole." *Id.* at 62,377. Fourth, the Commission pointed to LPSC's settlement with Entergy Louisiana, under which accelerated tax deductions over the remaining life of the Vidalia contract would flow directly and exclusively to the retail customers of Louisiana. *Id.* Together,

the four factors showed a focus on Louisiana, rather than on the System, and led the Commission to conclude that Vidalia was planned and operated as a Louisiana resource, not a System resource. *Id.*

*d. Implementation of Remedy.* The Commission found that its bandwidth remedy should not apply to calendar year 2003 as recommended by the ALJ, but should apply prospectively in calendar year 2006. 111 F.E.R.C. at 62,372–73. Any reallocation of costs prior to the Commission's June 1, 2005 decision would require the payment of refunds among the operating companies because data from 2003 and 2004 showed deviations among the companies that were greater than the +/- 11 percent bandwidth range. *Id.* at 62,373. The Commission reasoned that it could not, therefore, implement a retroactive bandwidth because it had previously found that refunds among Entergy operating companies are precluded by Section 206(c) of the Federal Power Act. *Id.* at 62,372 (citing *La. Pub. Serv. Comm'n, et al. v. Entergy Corp.*, 106 F.E.R.C. ¶ 61,228 (2004)).

### 3. FERC's Opinion No. 480-A

The Commission considered, and denied, requests for reconsideration of its decision. With respect to the four issues pertinent to this petition, it made the following findings.

*a. Disruption of Rough Equalization.* The Commission again found that "significant deviations experienced since 2000 demonstrate that the system is out of rough production cost equalization." 113 F.E.R.C. at 62,134. Because the disparities since 2000 "are far more than the system experienced for the 14 previous years, and are comparable to the disparities experienced from 1983 through 1985, when the Commission previously found that the system was not in

rough production cost equalization," the Commission reasoned that the System was out of rough equalization and again required a remedy. *Id.*

b.   *Bandwidth Remedy.*   The Commission denied rehearing on its imposition of a +/- 11 percent bandwidth. *Id.* at 62,139. Recognizing that neither the Commission nor the courts had ever "identified a percentage that would define with precision rough production cost equalization," the Commission concluded that its resolution of the issue appropriately balanced interests in "preventing undue discrimination" and in "not dramatically disrupting the system's historical operations and the states' settled interests and expectations . . . ." *Id.* at 62,138. It further found that its inflexible symmetrical bandwidth with upper and lower limits would keep the System "roughly balanced" while ensuring that no operating company was given "an undue preference or undue discrimination." *Id.* at 62,139.

c.   *Vidalia Hydropower Plant.*   The Commission denied rehearing on its finding that the Vidalia plant is not a System resource. *Id.* at 62,142. It again pointed to evidence in the record that Vidalia was not planned by the Entergy operating committee in a manner similar to other System resources and that tax and rate benefits associated with the project were retained exclusively by Entergy Louisiana. *Id.* at 62,143–44.

d.   *Implementation of Remedy.*   The Commission denied rehearing regarding its decision to implement the bandwidth remedy prospectively only. *Id.* at 62,140–41. The Commission again found that it was "prohibited by statute from ordering refunds," so was required to implement a prospective remedy. *Id.* at 62,141. The Commission clarified that, by ordering a 2006 implementation date for the

bandwidth, it was ordering that equalization payments be made in 2007 based on 2006 data. *Id.* at 62,140.

The present petitions for review from the Louisiana, Arkansas, and Mississippi Public Service Commissions followed.

## II.  THE JURISDICTION OF THE COMMISSION

The first issue in the petitions for review is whether FERC had jurisdiction to regulate the allocation of production costs among the Entergy operating companies. The Commission found that it had jurisdiction based on this Court's decision in *Mississippi Industries v. FERC*, 808 F.2d 1525 (D.C. Cir. 1987). We agree.

### A.

In *Mississippi Industries*, 808 F.2d at 1553, we held that the Federal Power Act "clearly" provides the Commission with jurisdiction to modify the allocation of capacity costs of an Entergy System resource from that provided in the System Agreement. Section 201(b)(1) of the Federal Power Act gives the Commission jurisdiction over the "transmission of electric energy in interstate commerce[,] . . . the sale of electric energy at wholesale in interstate commerce," and the facilities used for such transmissions and wholesale transactions, but excludes "jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy . . . ." 16 U.S.C. § 824(b)(1). Section 206 of the Act requires the Commission to set the "just and reasonable rate" where it finds that "any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule,

regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a).

In *Mississippi Industries*, we held that the Commission had jurisdiction under Sections 201(b)(1) and 206 to modify the allocation of capacity costs for an Entergy System nuclear plant even though it was a generating facility. It was undisputed that the nuclear capacity from the plant was sold at wholesale in interstate commerce because it was sold to Entergy operating companies in the multi-state system. *Miss. Indus.*, 808 F.2d at 1540. And, because the multi-state system was so highly integrated, we held that the costs borne by each operating company with respect to that generating facility "significantly affect[ed] the wholesale price" at which the capacity is sold in interstate commerce to the other operating companies in the System. *Id.* at 1541. Therefore, we concluded that Section 206 of the Federal Power Act provides the Commission jurisdiction to modify the capacity cost allocation in the System Agreement because that allocation affects the rate charged for wholesale transmissions within the jurisdiction of the Commission under Section 201(b)(1). *Id.* Also, we held that the generating facility exception of Section 201(b)(1) did not eliminate the Commission's jurisdiction because it does not apply where jurisdiction is specifically provided for in certain specified sections of the Act, including Sections 201 and 206. *Id.* at 1543. Therefore, because Sections 201(b)(1) and 206 provide jurisdiction to set rates for capacity costs that affect the price of energy sold at wholesale in interstate commerce and because the capacity costs of the Entergy nuclear generating plant affected such interstate wholesale rates, we concluded that the Commission had "clear" authority to reallocate the plant's capacity costs. *Id.* at 1544–45, 1553.

**B.**

Arkansas Electric Energy Consumers, Inc. ("AEEC") asks this Court to distinguish or overrule our decision in *Mississippi Industries* and find that the Commission lacked jurisdiction to reallocate production costs among the Entergy operating companies. We cannot.

AEEC first asserts that the Commission improperly asserted jurisdiction over a "generating facility" in violation of Section 201(b)(1) of the Federal Power Act. We decided this question in *Mississippi Industries*, where we considered the precise statutory language and caselaw argued by AEEC and concluded that the Commission had "undisputed authority over the wholesale rates of electric generating facilities in interstate commerce, which includes . . . the authority to reallocate the costs of [an Entergy system resource] across the system." *Miss. Indus.*, 808 F.2d at 1544; *see also Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 696 (D.C. Cir. 2000) ("FERC's assertion of jurisdiction over all wholesale transmissions, regardless of the nature of the facility, is clearly within the scope of its statutory authority."). We, of course, are without authority to overturn a decision by a prior panel of this Court. *See, e.g.*, *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 760 (D.C. Cir. 2003).

AEEC next asks us to distinguish *Mississippi Industries*, which involved the allocation of nuclear capacity costs from a plant run by a generating subsidiary, from this case, which involves the allocation of the gas production costs from facilities run by an operating subsidiary. Our decision in *Mississippi Industries*, however, did not hinge on the nature of the particular generation or subsidiary at issue, but on the fact that all generating capacity on the System had been built

and planned on an integrated basis by the System in order to meet the collective needs of the System. *See Miss. Indus.*, 808 F.2d at 1542. The System remains highly integrated, with the gas capacity at issue here built and operated by the System to meet its collective needs. Thus, the gas production costs here, like the nuclear costs in *Mississippi Industries*, affect the wholesale price at which capacity is sold in interstate commerce to other operating companies in the System and fall within the remedial jurisdiction of the Commission. We deny the petition as to this issue.

## III. THE REMEDY

Petitioners attack FERC's bandwidth remedy on several fronts. We review FERC's decision to impose a bandwidth remedy under the arbitrary and capricious standard, 5 U.S.C. § 706(2)(A); *Sithe/Independence Power Partners, L.P. v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999), treating FERC's factual findings as conclusive if supported by substantial evidence in the record, 16 U.S.C. § 825*l*(b). FERC's remedial choice is lawful if the agency has "examine[d] the relevant data and articulate[d] a . . . rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). For the reasons set forth below, we conclude that FERC has met that standard.

### A.

As an initial matter, APSC, MPSC, and AEEC suggest that the Entergy System has achieved and maintained rough cost equalization among its five participants. Were this true, FERC's bandwidth remedy would be unnecessary — a solution in search of a problem. Substantial evidence in the record, however, supports FERC's finding that System costs

were out of rough equalization and in need of correction. As FERC explained, "[w]hile history shows that production cost disparities have always existed, large disparities among the Operating Companies started to arise in 2000 and appear likely to continue into the future." 111 F.E.R.C. at 62,354. Between 1986 and 1999, the System's largest production-cost deviation was approximately 22 percent. Since then, the deviation has increased dramatically, averaging more than 33 percent between 2000 and 2002. In fact, the deviations in the System after 2000 were of comparable magnitude to the deviations that led to the remedy upheld in *Mississippi Industries*. Given this factual context, it cannot reasonably be disputed that the Entergy System is no longer in rough cost equalization.

AEEC argues that the current cost disparities are permissible because the System operating companies are not similarly situated, and each is ultimately responsible for financing and operating its own generation facilities. In *Mississippi Industries*, however, we explained that "[g]iven the degree of integration on the [System], FERC could properly conclude that the tremendous disparities in nuclear capacity costs among the operating companies disrupt the System's historical pattern of roughly equalizing capacity costs and thus constitute discrimination under section 206 of the Federal Power Act." *Miss. Indus.*, 808 F.2d at 1557. Likewise, FERC could properly conclude in this matter that the large deviations in production costs among the operating companies have undermined the System's history of rough equalization. As mentioned above, the current cost deviations are numerically similar to the "tremendous disparities" that were present in *Mississippi Industries*. *Id.* Consequently, the determination that a remedy is needed is as reasonable now as it was then.

APSC, MPSC, and AEEC next criticize FERC for calculating rough cost equalization by measuring the total production cost deviations in the System. They contend that other metrics, such as deviations measured in cents per kilowatt hour, would have shown that the System still enjoys rough equalization. In a case like this, which calls upon FERC to make fact-intensive judgment calls on the basis of its superior technical expertise, we will only disturb FERC's selection of one methodology over another if its choice is not the product of reasoned decisionmaking. *Cf. El Paso Natural Gas Co. v. FERC*, 96 F.3d 1460, 1464 (D.C. Cir. 1996) ("Because this inquiry is fact intensive, it is appropriate to give significant deference to the Commission's choice of a valuation methodology."). ALJ Brenner rejected petitioners' proposed methodologies after concluding that they were potentially misleading, ill-suited to revealing relative differences, and inferior as a means of making comparisons over time, *see* 106 F.E.R.C. at 65,111, and FERC affirmed the ALJ's determination of the appropriate methodology, *see* 111 F.E.R.C. at 62,353; 113 F.E.R.C. at 62,134. We have no reason to interfere with FERC's reasoned choice of methodology and so defer to its expertise.

AEEC also contends that, even if the System is no longer roughly equalized, no remedy is necessary because Entergy's Strategic System Resource Plan ("SSRP") will return the System to rough equalization. The SSRP, Entergy's long-term plan to satisfy customer demand, spreads among the operating companies the burden of providing generation. 113 F.E.R.C. at 62,135. This burden-sharing will, according to AEEC, distribute production costs across the companies, thereby reducing cost deviations within the System. FERC reasonably found that the SSRP did not eliminate the need for a remedy that would return the System to rough equalization. Even under Entergy's most optimistic projections, the SSRP would

have only reduced the total production-cost deviation to 31 percent in 2003, 27 percent in 2004, and 18 percent in 2005. 111 F.E.R.C. at 62,356. Moreover, the SSRP is merely aspirational; there is no assurance that it will work as intended, especially with the steady and sustained upward march of natural gas prices. *Id.*

Lastly, AEEC argues that FERC arbitrarily and capriciously neglected to assess the rough equalization of production costs using a "life of the contract" standard, which AEEC contends the agency has applied in similar cases. Under this standard, the agency must consider the distribution of burdens and benefits between contracting parties over the full term of the agreement, and must not assess costs at one particular point in time. To support this proposition, AEEC cites FERC's decision in *Pontook Operating Limited Partnership v. Public Service Co. of New Hampshire*, 94 F.E.R.C. ¶ 61,144 (2001). In that case, FERC held that "the proper time frame to use in determining the justness and reasonableness of a long-term, fixed-rate contract is over the 'life of the contract,' not a 'snapshot in time.' " *Id.* at 61,552. FERC did not act arbitrarily and capriciously, however, because the cases in which the agency has applied the contested standard differ from this case in at least one important respect: FERC applies the life of the contract standard where the parties have agreed to a "fixed-rate contract," *id.*, but the Entergy System Agreement is not such a contract. Under a fixed-rate contract, parties relinquish their right unilaterally to request a rate change from FERC. *See Me. Pub. Utils. Comm'n v. FERC*, 454 F.3d 278, 283 (D.C. Cir. 2006); *Potomac Elec. Power Co. v. FERC*, 210 F.3d 403, 405 (D.C. Cir. 2000). The System Agreement, by contrast, allows individual companies to seek unilateral rate changes. *See* Entergy System Agreement § 4.12 ("Each Company reserves the right to unilaterally seek amendments or changes

in the terms and conditions of service and increases or decreases in the rates and charges provided in any of the Service Schedules from any regulatory body having or acquiring jurisdiction thereover."). Applying a life of the contract standard in this instance, where the contract does not include a fixed-rate provision, would undermine a clear purpose of the contract: to allow for incremental rate adjustments that might not occur if that decision hinged on considering the distribution of benefits and burdens over the entire term of the agreement. And even if the life of the contract standard were to apply, FERC did not base its decision on a "snapshot" of production costs at one particular point in time, but instead took into account two decades of the System Agreement's history. *See* 111 F.E.R.C. at 62,370–71.[1]

## B.

FERC concluded that the right remedy to return Entergy to rough equalization of its System production costs was a fixed and symmetrical +/- 11 percent bandwidth. LPSC, APSC, and MPSC disagree. LPSC believes that a narrower bandwidth is necessary, while APSC and MPSC suggest either a bandwidth with no lower boundary, or else one that is more flexible. We owe FERC great deference in reviewing its selection of a remedy, for "the breadth of agency discretion is, if anything, at zenith when the action assailed relates primarily . . . to the fashioning of policies, remedies and sanctions." *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967); *see also Ariz. Corp. Comm'n v.*

---

[1] We also reject AEEC's argument that the System Agreement has become unconscionable. Even if FERC was obliged to allow Arkansas consumers to enjoy the fruits of their "investment" in certain generation facilities, its +/- 11 percent bandwidth remedy provides significant latitude for some operating companies to enjoy lower production costs before redistribution begins.

*FERC*, 397 F.3d 952, 956 (D.C. Cir. 2005) (noting that FERC "wields maximum discretion" when choosing a remedy). Because we find that FERC has not abused its ample discretion, we uphold its selection of the +/- 11 percent bandwidth. *See La. Pub. Serv. Comm'n v. FERC*, 174 F.3d 218, 225 (D.C. Cir. 1999) ("[W]e will set aside FERC's remedial decision only if it constitutes an abuse of discretion.").

LPSC argues that FERC's bandwidth is too broad and does not do enough to eliminate cost discrimination within the System. In *Mississippi Industries*, however, we concluded that "the Commission's chosen remedy is sufficient to remedy the *undue* discrimination on the System; that is, the Commission could properly conclude that the remaining cost disparities do not constitute unlawful discrimination." 808 F.2d at 1565. Here, too, FERC could have done more to eliminate cost disparities within the System, but it need not have done more to eliminate *undue* disparities. As the Commission noted, it "is charged with eliminating undue discrimination, [but] it does not have to eliminate all forms of discrimination." 111 F.E.R.C. at 62,360. Moreover, in *Mississippi Industries* we were especially deferential to FERC's remedy because it was the product of a difficult policy choice:

> In deciding whether to order production cost equalization or nuclear investment equalization, the Commission confronted a major policy choice. Though both alternatives would remedy undue discrimination, the former would represent a dramatic disruption of the System's historical operations and of the states' settled interests and expectations. Accordingly, FERC chose the latter alternative. We

> hold that the Commission's decision was both rational and within its discretion.

808 F.2d at 1565. Faced with a similar predicament here, FERC again reasonably selected a remedy that would minimize the likelihood of disrupting the System. 113 F.E.R.C. at 62,138. We must respect this reasoned choice.

APSC and MPSC argue that the bandwidth should have had no lower boundary, such that no operating company could be more than 11 percent *above* the System average of production costs, but companies could be more than 11 percent *below* the System average. Alternatively, they argue that the bandwidth should have been more flexible — i.e., instead of being triggered when at least one company is either above or below 11 percent of the System average of production costs, the remedy should be invoked only if the maximum deviation of production costs in the System is greater than 22 percent. They contend that FERC's symmetrical and fixed bandwidth is unduly discriminatory, impairs cost-cutting incentives, and prevents Entergy Arkansas and Entergy Mississippi from reaping the full benefits of their already paid-for and highly-depreciated coal and nuclear capacity.

In rejecting APSC and MPSC's argument, the Commission stated:

> [W]e disagree with the Arkansas and Mississippi Commissions' argument that the Commission erred in adopting an inflexible symmetrical bandwidth. Entergy's system is highly integrated, and therefore Entergy's planning and operation affects the cost disparities among its five Operating Companies. . . . Our decision to impose the 11 percent bandwidth . . .

allows Operating Companies to deviate up to 11 percent from the system average. A symmetrical remedy ensures that the system remains roughly balanced and does not instill an undue preference or undue discrimination on any operating company.

113 F.E.R.C. at 62,139. The Commission was well within the bounds of its discretion in choosing a fixed and symmetrical bandwidth, because the operating companies are collaborators in the Entergy System functioning for their *mutual* benefit. A bandwidth that was not fixed and symmetrical would allow instances in which a low-cost company may be greatly advantaged, or a high-cost company greatly disadvantaged. Imagine, under the petitioners' proposed bandwidth without a lower boundary, that the highest-cost company is 10 percent above the System average while the lowest-cost company is 15 percent below average. Or imagine, under the petitioners' proposed flexible bandwidth, that the highest-cost company is 15 percent above average while the lowest-cost company is 5 percent below average. In either circumstance, no remedial measures would apply, despite the fact that one of the companies bears costs that lie well outside the System average. Either result would be inconsistent with the nature of the System.

Because we find FERC's adoption of the +/- 11 percent bandwidth to be within its discretion, we deny the petition as to this issue.

## IV.  THE VIDALIA HYDROPOWER PLANT

LPSC challenges FERC's ruling that the Vidalia hydropower plant ("Vidalia") should not be treated as an Entergy System resource. Relying on four "distinguishing factors" that set the plant apart from System resources, FERC

found that Vidalia was built to benefit Louisiana and that the plant's production costs should stay in Louisiana. 111 F.E.R.C. at 62,375; 113 F.E.R.C. at 62,141. LPSC argues that the Vidalia contract was intended to benefit the System as a whole and that the plant's production costs should be included in the System's bandwidth calculations. Such inclusion would push the System further from rough equalization and shift some of the costs associated with the project onto other members. Because substantial record evidence supports FERC's decision, we deny the petition for review as to this issue.

We review FERC's findings regarding Vidalia under the substantial evidence standard. 16 U.S.C. § 825*l*(b) ("The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."). This deferential standard of review "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *FPL Energy Main Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002). While there may be evidence supporting petitioner's position, we must determine "not whether record evidence supports [petitioner]'s version of events, but whether it supports FERC's." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003). LPSC argues that "FERC was required under the law to provide deference to the findings of the [administrative law judge.]" LPSC Br. at 30. Although the Commission must give "attentive consideration" to an administrative law judge's findings, those findings are not entitled to any special deference. *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 853 (D.C. Cir. 1970). Rather, they are treated as "part of the record" to which we look to ensure that the Commission's decision is supported by substantial evidence. *Id.* In other words, the Commission's decision cannot depart from the administrative law judge's findings without support from the

record, but "in the last analysis, it is the agency's function, not the [administrative law judge's], to make the findings of fact and select the ultimate decision, and where there is substantial evidence supporting each result it is the agency's choice that governs." *Id.*

LPSC challenges each of the four distinguishing factors upon which FERC relied in deciding that Vidalia was not a System resource. First, LPSC argues that the Vidalia contract is no different than those of other System resources, asserting that local operating companies always obtain local retail rate recovery, and that local retail regulators and operating companies never review the prudence of new resources built or acquired in other jurisdictions. Second, as to the significant cost shifts that would result from including Vidalia in the System's bandwidth calculation, LPSC asserts that this is the real reason for the Commission's decision, and an invalid one. In response to FERC's third distinguishing factor — the finding that Vidalia was not part of an overall System plan — LPSC contends that hydropower fit within the System's broader efforts to move away from dependence on natural gas-fired generation. LPSC also points to Vidalia's inclusion in the Load and Capability Forecast[2] and the MSS-1[3] as

---

[2] Entergy explains that the Load and Capability Forecast is a tool that helps the System operating committee to plan future resource acquisitions by determining how much energy is available to the individual operating companies. 106 F.E.R.C. at 65,117.

[3] The MSS-1 is one of seven service schedules in the System Agreement used to equalize costs among the members. "MSS-1 is designed to allocate costs for maintaining the reserve responsibility capacity among the Operating Companies." 111 F.E.R.C. at 62,361. To equalize reserve capacity among the operating companies, the MSS-1 requires "that the 'short' companies make payments to the 'long' companies under a formula based on the 'long' companies'

evidence that Vidalia was approved by the Entergy operating committee and planned as part of the System. Fourth, with regard to Vidalia's local tax benefits, LPSC claims that tax benefits for System resources are always recorded on the local operating company's books and reflected in its retail rates, making the Vidalia contract indistinguishable from that of any other System resource.

We conclude that FERC's ruling was supported by substantial evidence. LPSC's arguments fail to show that FERC's decision departed from the record. LPSC contends that local rate recovery of costs is common to System resources, but FERC pointed to the unique nature of the Vidalia contract, which required full recovery of power costs from Louisiana ratepayers. LPSC points out that other retail regulators never review the prudence of new resources built or acquired in other jurisdictions, but given the unusual manner in which Vidalia was planned and built, and the Commission's concern that potential litigation by individual retail jurisdictions might result if Vidalia's costs were allocated to the System, FERC acted reasonably in taking into account the lack of opportunity for non-Louisiana retail regulators to review the Vidalia contract. LPSC also argues that it is improper to take account of the cost shifts associated with Vidalia. But the costs of the Vidalia project were high, and the capacity to generate power low. For Louisiana, these costs would be partly offset by job creation and tourism resulting from the plant, but, as FERC explained, Vidalia's high-cost energy "would hardly be of any interest to the Entergy system as a whole." 111 F.E.R.C. at 62,377. In this light, the fact that significant cost shifts would occur within the System if Vidalia were included supports FERC's

---

prior year's cost of gas and oil-fired steam generation." 106 F.E.R.C. at 65,105.

conclusion that Vidalia was not intended as a System resource.

The record also supports the Commission's conclusion that Vidalia was a local affair. LPSC was deeply involved in the planning of the project, approving the contract and guaranteeing full recovery of its costs through Louisiana ratepayers. Entergy, on the other hand, was involved minimally, if at all. The Entergy System did not initiate the planning or the purchase of Vidalia. 111 F.E.R.C. at 62,374. The System had no centralized and deliberate plan to increase reliance on hydropower by building resources like Vidalia, even if it were the case, as LPSC asserts, that hydropower somehow fit within the System's broader trend of seeking diverse sources of power. LPSC's settlement with Entergy Louisiana granting the latter exclusive retention of Vidalia's accelerated tax deductions for the remaining life of the contract further supports FERC's ruling that Vidalia was built as an Entergy Louisiana-only resource. The Commission addressed and rejected LPSC's argument that Vidalia's unique tax settlement did not distinguish it from other resources. 113 F.E.R.C. at 62,144. Especially in view of the other evidence that Vidalia was a local project, we agree with the Commission that Entergy Louisiana's exclusive retention of the tax benefits "strongly suggests that Vidalia is an [Entergy Louisiana]-only resource." 111 F.E.R.C. at 62,378. In view of these considerations, and based on the record, FERC reasonably concluded that it would be inappropriate "[t]o allow Louisiana to shift the escalating costs of the Vidalia contract to other states on the Entergy System and not accept responsibility for its own decision making." *Id.* at 62,375.

The inclusion of the Vidalia plant in the Load and Capability forecast and the MSS-1 provides the strongest

support for LPSC's argument that Vidalia was planned as a System resource. LPSC argues that these actions show that the Entergy System operating committee approved Vidalia. But Entergy explained that Vidalia's inclusion in the Load and Capability Forecast did not signify System approval of the resource. Rather, it indicates that Entergy was planning for something it did not control. The Forecast is used to project how much power will be available to individual operating companies so that the System can measure needs and make appropriate plans for resource acquisition. 106 F.E.R.C. at 65,117. As to Vidalia's assignment of credit in the MSS-1, FERC explained:

> This credit simply acknowledges that Vidalia provides a measurable but negligible contribution to System capacity. It only shows that Vidalia exists and can serve load. It does not prove why or for whom it was planned, and the fact that Entergy recognizes the existence of Vidalia and provides a capacity credit is no reason for shifting the Vidalia costs to other Operating Companies.

113 F.E.R.C. at 62,143. Because LPSC does not refute these explanations, and our review is deferential, we see no reason to upset FERC's ruling based on Vidalia's inclusion in the Load and Capability Forecast and MSS-1. FERC's determination that Vidalia was not planned as a System resource is supported by substantial record evidence. We deny the petition as to this issue.

## V.  IMPLEMENTATION

Petitioner LPSC raises two final contentions: (1) that FERC acted arbitrarily in declining to order retroactive refunds for the cost disparities Louisiana ratepayers

experienced when the Entergy System was not in rough equalization; and (2) that FERC impermissibly delayed the implementation of the bandwidth remedy. In response, FERC contends that neither issue is ripe for review. Because "[r]ipeness is a justiciability doctrine" that is " 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction,' " we consider it first. *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003) (quoting *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 n.18 (1993)). Thereafter, because we conclude that both issues are ripe for review, we address the merits of LPSC's arguments.

## A.

"Determining whether administrative action is ripe for judicial review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 808. FERC's ripeness argument concerns only the fitness element. "Among other things, the fitness of an issue for judicial decision depends on whether it is 'purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.' " *Atl. States Legal Found., Inc. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (quoting *Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1204 (D.C. Cir. 1998)).

Although FERC's orders in this case addressed and resolved both its ability to order retroactive refunds and the timing of its bandwidth implementation, *see* Opinion No. 480, 111 F.E.R.C. at 62,371–72; Opinion No. 480-A, 113 F.E.R.C. at 62,140–41, FERC nevertheless asserts that the orders are insufficiently final to be fit for review. They are not final, FERC insists, because the Commission has recently

announced that it will again address those issues in the compliance proceeding in this docket, *see La. Pub. Serv. Comm'n v. Entergy Servs., Inc*., 119 F.E.R.C. ¶ 61,095, 2007 WL 1232249, at \*1, \*6 (2007), in light of our holding in a different case involving the inclusion of interruptible load in the calculation of peak load on the Entergy system, *see La. Pub. Serv. Comm'n v. FERC*, 482 F.3d 510, 520 (D.C. Cir. 2007) (*LPSC II*) (remanding to FERC for reconsideration of its determination that "it could not make the finding necessary to order some of the Entergy Operating Companies to make refunds to other Entergy Operating Companies in order to compensate them for costs unjustly or unreasonably allocated to them"). According to FERC, neither issue will be ripe until it has entered, in the compliance proceeding, a "subsequent order on refunds . . . [that will] address the LPSC's entitlement to retroactive relief for years prior to 2006 . . . [and] the LPSC's 'timing' argument." FERC Supplemental Br. at 2.

To buttress this claim, FERC points to cases in which we have found that petitioners would not suffer an injury-in-fact until the Commission resolved a compliance filing.[4] But unlike this case, those cases dealt with orders that were clearly contingent on subsequent proceedings or events. Accordingly, we postponed review until a time when the "agency's action [became] sufficiently final." *Clean Air Implementation Project*, 150 F.3d at 1204 (quoting *Natural Res. Def. Council, Inc. v. EPA*, 22 F.3d 1125, 1133 (D.C. Cir. 1994)). Opinions No. 480 and No. 480-A, by contrast, are not

---

[4]*See, e.g.*, *N.M. Att'y Gen. v. FERC*, 466 F.3d 120, 122 (D.C. Cir. 2006); *DTE Energy Co. v. FERC*, 394 F.3d 954, 960–61 (D.C. Cir. 2005); *see also Amoco Prod. Co. v. FERC*, 271 F.3d 1119, 1123 (D.C. Cir. 2001); *N. Ind. Pub. Serv. Co. v. FERC*, 954 F.2d 736, 740 (D.C. Cir. 1992).

conditional. To the contrary, those orders make clear that FERC had conclusively resolved the refund and timing issues presented by LPSC. *See* Opinion No. 480, 111 F.E.R.C. at 62,371–72 ("The Commission addressed this same issue (i.e., the reallocation of costs among Entergy Operating Companies) in another Entergy proceeding and held unambiguously that refunds . . . were prohibited. . . . Thus, [the bandwidth] we order here [will become] effective for the calendar year 2006."); Opinion No. 480-A, 113 F.E.R.C. at 62,140 ("[A]doption of a remedy that would involve prior years would necessarily result in refunds, which . . . we are specifically prohibited from providing under section 206(c) of the FPA . . . ."). FERC's recent announcement that it will again address those issues in the compliance proceeding in light of our decision in *LPSC II* cannot transform long-final orders into conditional ones. We therefore hold that the refund and timing issues are ripe for review and move to the merits of petitioner's argument.

**B.**

Section 824e(b) of the FPA authorizes FERC to "order refunds of any amounts paid . . . in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force." 16 U.S.C. § 824e(b). Section 824e(c), however, curtails this refund authority by "prohibit[ing] the Commission from ordering one subsidiary of a holding company to refund monies to a sister subsidiary unless the Commission determines the holding company will not experience any reduction of revenue because of the payor subsidiary's 'inability . . . to recover such increase in costs' from its ratepayers." *LPSC II*, 482 F.3d at 515 (alteration in original) (quoting 16 U.S.C. § 824e(c)).

In this case, petitioner LPSC asked FERC to order a retroactive refund to redress cost imbalances that Louisiana ratepayers suffered during the years in which the Entergy System was out of rough equalization. FERC declined to order such refunds, relying solely on the Commission's holding in *Louisiana Public Service Commission v. Entergy Corp.*, Opinion No. 468, 106 F.E.R.C. ¶¶ 61,228, at 61,805–06 (2004) (*LPSC I*), that retroactive refunds are prohibited by Section 824e(c). *See* Opinion No. 480, 111 F.E.R.C. at 62,371–72; Opinion No. 480-A, 113 F.E.R.C. at 62,140. In *LPSC II*, however, we held that the Commission's order in *LPSC I* had failed to offer a reasoned explanation for why the cost of Commission-ordered refunds by one group of Entergy subsidiaries to another could not be recovered, and hence for why they are barred by § 824(e). *See LPSC II*, 482 F.3d at 520. Our holding in *LPSC II* thus squarely rejects the only rationale upon which FERC relied for denying refunds in this case. We therefore grant the petition for review on this issue and remand to FERC for further proceedings.

## C.

Finally, we turn to LPSC's claim that FERC impermissibly delayed the implementation of the bandwidth remedy. In Opinion No. 480, decided on June 1, 2005, FERC declared that the remedy would become "effective for the calendar year 2006." 111 F.E.R.C. at 62,372. LPSC sought rehearing and requested that the bandwidth remedy take effect in 2005 to remedy the undue discrimination that occurred from June 1, 2005 forward. Delaying implementation until 2006, LPSC argued, would be arbitrary and capricious. It would also, LPSC maintained, run contrary to FERC's statutory mandate, upon finding rates unduly discriminatory,

to determine the rate "to be thereafter observed and in force, and . . . fix the same by order." 16 U.S.C. § 824e(a).

In its Order on Rehearing, FERC elaborated on the rationale for the timing of the bandwidth remedy. The Commission explained that it would implement the bandwidth:

> on a prospective basis, as required by section 206 of the FPA, after a full calendar year of data becomes available. . . . [T]he use of the first calendar year of data following the issuance of Opinion No. 480 is the most appropriate and equitable way and time to implement the bandwidth remedy. . . . Moreover, adoption of a remedy that would involve prior years would necessarily result in refunds, which . . . we are specifically prohibited from providing under section 206(c) of the FPA, in any event.

Opinion No. 480-A, 113 F.E.R.C. at 62,140. FERC stated that it would collect cost disparity data from January 1, 2006 to December 31, 2006 — the first full calendar year after June 1, 2005 — and order payments in 2007. *See La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 119 F.E.R.C. ¶ 61,095, 2007 WL 1232249, at *6 (2007).

FERC's belief that "adoption of a remedy that would involve prior years would necessarily result in refunds," Opinion No. 480-A, 113 F.E.R.C. at 62,140, was apparently based on the assumption that compensating LPSC for the six months of the calendar year that post-date June 1, 2005 would require it to reach back to January 1, 2005 — a time that pre-dates June 1, 2005 — in order to collect a full calendar year of cost data. *Cf.* FERC Supplemental Br. at 2 ("The bandwidth remedy is applied once a year. . . . Because

Opinion No. 480 found that FPA § 206(c) precluded retroactive relief, the Commission imposed the annual bandwidth prospectively beginning with 2006, the first full year following its orders."); Oral Arg. Recording at 1:56:03–1:57:42. But even if FERC is correct that granting LPSC's requested relief "would necessarily result in refunds," that would only justify delayed implementation if FERC were also correct that it is "specifically prohibited" from ordering refunds. Opinion No. 480-A, 113 F.E.R.C. at 62,140. And as we held in *LPSC II*, FERC has so far failed to offer a reasoned explanation for why it is prohibited from ordering one Entergy subsidiary to pay refunds to another.

At oral argument, FERC's counsel noted that Opinion 480-A contains another reason for delay, namely that using "the first calendar year of data following the issuance of Opinion No. 480 *is the most appropriate and equitable way and time* to implement the bandwidth remedy." *Id.* (emphasis added). But that is not a reason; it is a conclusion. Nothing in Opinion 480-A explains *why* FERC believes that the first calendar year is the most appropriate and equitable time. Hence, it does not rebut LPSC's contention that it is an abuse of discretion for the Commission to delay implementation of a remedy until 2007, having found on June 1, 2005 that the System Agreement's rates were unduly discriminatory. Indeed, confronting a similar FERC decision in *LPSC II*, we held that the Commission had acted arbitrarily and capriciously "by allowing Entergy to phase interruptible load out of its calculation of peak load over the course of a year," thereby permitting it to "continue to bill for costs the Commission has determined may not be justly and reasonably recovered." 482 F.3d at 518.

In the absence of a reasonable explanation for FERC's decision to delay implementation of the bandwidth remedy,

we grant the petition for review on this issue as well and remand for further proceedings.

## VI.  CONCLUSION

For the foregoing reasons, we deny the petitions in part, grant them in part, and remand the matter to the Commission for reconsideration of its decision to deny retroactive refunds and to delay implementation of the bandwidth remedy.

*So ordered.*