IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Philadelphia Industrial and     :
Commercial Gas Users Group,     :
          Petitioner     :
     :
     v.     :     No. 128 C.D. 2024
     :
Pennsylvania Public Utility     :     Argued: December 9, 2024
Commission,     :
          Respondent     :


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE MATTHEW S. WOLF, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION
BY JUDGE McCULLOUGH               FILED: August 1, 2025


When the Pennsylvania Public Utility Commission (Commission) approves a rate increase for a gas utility company, it must ensure that the utility's Class Cost of Service Study (CCOSS) accurately reflects how and why that rate increase will be "allocated" among the customer classes. This is especially critical where, as here, the Commission approved a proposed base distribution rate increase[1] for Philadelphia Gas Works (PGW) in the amount of $85.2 million, and allocated $26.2 million of that increase to the Rate Interruptible Transportation (Rate IT or interruptible) customer class, whose services can be interrupted at any time and who must therefore, at their own expense, establish and maintain a continual alternative source of energy.

---

[1] This appeal only concerns the costs related to delivering natural gas.

The requirement that rates be "just and reasonable" under Section 1301 of the Pennsylvania Public Utility Code (Code), 66 Pa.C.S. § 1301, is not satisfied by generalities or sweeping statements. In Pennsylvania, just and reasonable rates **must** reflect the principle of cost causation. *Lloyd v. Pennsylvania Public Utility Commission*, 904 A.2d 1010, 1015 (Pa. Cmwlth. 2006). However, the Commission here has seemingly approved PGW's allocation of a portion of its fixed distribution mains costs to the Rate IT class as Firm based on the historic frequency of interruptions and the conclusion that the service provided to Rate IT class is "technically uninterruptible."

After careful review, we find that the Commission's reasons for approval of PGW's proposed cost allocation method are inadequately explained. Section 703(e) of the Code, 66 Pa.C.S. § 703(e), requires the Commission's decision to be sufficiently detailed to enable the court on appeal to determine the controverted question presented by the proceedings and whether proper weight was given to the evidence. Among the deficiencies in the Commission's decision, as more fully discussed in length below, are the Commission's (1) apparent and unexplained deviation from its and this Court's prior precedent, *Lloyd*, which requires gas utilities to adhere to cost causation principles to determine rate responsibility; (2) apparent and unexplained adoption of a new retrospective value-of-service or benefits principle to allocate fixed distribution mains costs among disparate classes, even though those fixed costs are characteristically allocatable only to Firm services customers, for whom the distribution system is designed and constructed to meet the peak demands of the Firm service customer Class; and (3) failure to address the justness and reasonableness of requiring Rate IT customers to continue to adhere to the mandatory and costly requirements for interruption under PGW's Tariff or why this does not violate Section 1303 of the PUC

2

Code, which prohibits a utility from collecting rates from a customer for any service not specified in its Tariff.

Accordingly, and for the reasons that follow, we vacate the order of the Commission and remand to the Commission for additional fact finding, if necessary, and a more reasoned explanation and clarification of the specific aspects of its rationale we have found deficient as explained more fully below.

## I. Facts and Procedural History

Philadelphia Industrial and Commercial Gas Users Group[2] (Petitioner), is a member of the Rate IT class. PGW is a municipal public utility company, owned by the City of Philadelphia (City). PGW manages a distribution system of approximately 3,000 miles of gas mains and 476,000 service lines supplying approximately 500,000 customers in Pennsylvania. PGW's service territory consists of an urban area of 134 square miles and is the exclusive distributor of natural gas within the limits of the City.

*Firm Customers and Interruptible Customers*

Gas utilities typically have two categories of service that customers can choose from, "firm" and "interruptible." **Firm** service customers are expected to receive uninterrupted service of natural gas, even during periods of high demand on the system. In contrast, Rate IT customers (or **interruptible** customers), use the distribution system each and every day but **may face interruptions of natural gas service during periods of high demand on the system**. During the "interruption," a Rate IT customer would not receive all or a portion of the gas that would normally be delivered. To be eligible for Rate IT service, Rate IT customers are required to curtail

---

[2] Petitioner is comprised of the following Rate IT customers: Einstein Healthcare Network, Newman & Company, Philadelphia College of Osteopathic Medicine, Temple University and Thomas Jefferson University.

3

their natural gas usage any time PGW determines, in its sole judgment, that available capacity is required to meet the needs of PGW's Firm service customers. In other words, PGW can "interrupt" or stop service to Rate IT customers at its discretion.

In general, customers who choose interruptible service pay lower distribution rates than Firm service customers due to PGW's sole discretion to interrupt their service. Hence, they also must pay for "back up" service by other energy means. Specifically, in order to qualify for interruptible service, a customer must have the ability to curtail or interrupt usage upon eight hours' notice either by obtaining and maintaining equipment that uses an alternate fuel source or by implementing a process that allows the customer to manage its business without the use of gas for the duration of an interruption. As set forth in PGW's Tariff, Rate IT customers are "subject to curtailment or interruption at any times" and "[PGW] may curtail (reduce) or interrupt deliveries to the [Rate IT] Customer whenever, at [PGW's] sole discretion, it determines that the available capacity in all or a portion of its system is projected to be insufficient to meet the requirements of all Customers or in the event a [natural gas supplier] fails to meet delivery obligations." (Petitioner's Br., App. C.) A Rate IT customer must "maintain the ability to curtail or interrupt usage upon eight hours' notice" and, in the event of a system emergency, "upon notice by [PGW], the Customer shall use its best efforts to curtail or interrupt usage upon less than eight hours' notice." *Id.* Rate IT customers "must have and maintain complete and adequate standby non-natural gas energy (*e.g.*, oil, propane, electric, steam) and equipment for alternate operation in the event of interruption of Gas Service." *Id.*

4

In this current base rate proceeding, PGW sought an increase in jurisdictional natural gas revenues of $85.2 million on a total revenue basis.[3] A utility's revenue requirement represents the total revenue that the utility needs to collect through the rates it charges to the public to cover its cost of service. PGW sets its rates based upon the Cash Flow Method of ratemaking.[4] As a Cash Flow regulated company, PGW's operations are entirely funded from rates, either indirectly as a result of short-term or long-term borrowing, which PGW must then pay back using the funds raised from the rates charged to its ratepayers, or directly through charges to its customers. PGW last filed for an increase in natural gas base rates in 2020. PGW represented that

---

[3] PGW's request for a general base rate increase is governed by Section 1308(d) of the Code, 66 Pa.C.S. § 1308(d). Section 1308(d) of the Code provides the procedures for changing base rates, the time limitations for the suspension of the new rates, and the time limitations on the Commission's actions. 66 Pa.C.S. § 1308(d). "Under traditional ratemaking, utilities may not change rates charged to customers outside of a base rate case." *McCloskey v. Pennsylvania Public Utility Commission*, 127 A.3d 860, 863 n.2 (Pa. Cmwlth. 2015).

[4] In 2010, the Commission issued a Policy Statement setting forth the criteria and the financial and other considerations that are to be examined in setting PGW's base rates at just and reasonable levels. *See* 52 Pa. Code § 69.2701-2703. In the Policy Statement, the Commission described the requirements of the Cash Flow Method as follows:

> (b) The Commission is obligated under law to use the cash flow methodology to determine PGW's just and reasonable rates. Included in that requirement is the subsidiary obligation to provide revenue allowances from rates adequate to cover its reasonable and prudent operating expenses, depreciation allowances and debt service, as well as sufficient margins to meet bond coverage requirements and other internally generated funds over and above its bond coverage requirements, as the Commission deems appropriate and in the public interest for purposes such as capital improvements, retirement of debt and working capital.

52 Pa. Code § 69.2702(b).

it filed its current rate increase request because materials increased and capital expenditures have reduced its projected cash and liquidity.

Public utility rates should enable the utility to recover its cost of service and should allocate this cost among its customers. In order to demonstrate the basis for its proposed rate allocation, PGW provided, *inter alia*, a CCOSS as part of its initial filing. PGW's CCOSS is the subject of this appeal.

When a utility files for a rate increase and the proposed increase exceeds $1 million, the utility must include with its filing an allocated CCOSS in which it assigns to each customer class a rate, based upon operating costs that it incurred in providing that service. 52 Pa. Code § 53.53.IV.B.;[5] *Lloyd*, 904 A.2d at 1015.

A CCOSS sets forth how the utility proposes to allocate its costs among different customer classes. A CCOSS is essential in determining the distribution of costs among different customer classes and ensuring that rate increases or decreases are just and reasonable. A CCOSS is used to determine each class's responsibility for a utility's costs. A CCOSS determines whether the revenue a class generates for a utility covers the costs incurred by the utility to provide service to that class.

---

[5] Section 53.53.IV.B. of the Commission's Regulations provides, in relevant part:

> Each gas utility shall submit the following simultaneously with any rate increase filing:
>
> 1. Provide a Cost of Service Study showing the rate of return under the present and proposed tariffs for all customer classifications. The study should include a summary of the allocated measures of value, operating revenues, operating expenses and net return for each of the customer classifications **at original cost** and at the 5-year trended original cost.

52 Pa. Code § 53.53.IV.B. (emphasis added).

(Reproduced Record (R.R.) at 123a.) In Pennsylvania and throughout the United States, "cost causation" is a basic principle to use when designing a cost allocation method. Under the cost causation principle, it has been traditionally required that all approved energy rates reflect to some degree the costs actually caused by the customer who must pay for them. *Lloyd*, 904 A.2d at 1015. For purposes of cost allocation, customers are grouped into separate "homogenous" classes according to usage patterns and service characteristics common among groups of customers.[6] (R.R. at 123a, 166a.) The two classes at issue here are the Rate IT customers and Firm service customers.

PGW proposed a 22.7% increase to Rate IT customers. As part of its CCOSS, PGW relied heavily on the fact that Rate IT service customers had been interrupted only once in the past 20 years (in 2004) and argued that the Rate IT class was substantially underpaying its cost of service. Thus, **it treated Rate IT (*i.e.*, customers receiving interruptible service) the same as Firm service customers**. PGW did so by allocating the costs PGW would incur to provide service to all customers (including Rate IT customers) during periods of peak demand. In other words, **PGW allocated to Rate IT the costs of providing natural gas during peak day events, even though Rate IT customers are not guaranteed to receive service during peak day events**. PGW maintained that since the Rate IT customers have been interrupted only once since 2004, they should be treated as Firm service customers that are supplied natural gas during peak periods and should be allocated costs accordingly.

---

[6] There are numerous different customer classes to which PGW allocates costs including: residential, commercial, industrial, municipal, Philadelphia Housing Authority (PHA) general, PHA-Rate 8, Developmental Natural Gas Vehicle Services, Interruptible, Grays Ferry Cogeneration Partnership, and Vicinity Energy Philadelphia.

Complaints were filed against the proposed rate increase by the Office of Consumer Advocate (OCA),[7] Petitioner, and several others. The matter was assigned to two Office of Administrative Law Judges (ALJ) for the scheduling of any necessary hearings and the issuance of a Recommended Decision. On May 23, 2023, two Public Input in-person hearings were held. On May 24, 2023, two Public Input telephonic hearings were held. The parties served their direct testimonies and exhibits. Evidentiary hearings were held on July 11 and July 12, 2023.

### A. PGW's CCOSS

### 1. Cost Allocation Study - Methodology

The issues raised by Petitioner before the Commission involved an alleged error in PGW's CCOSS, specifically the manner in which it allocated distribution costs to the Rate IT class.[8] The CCOSS presented by PGW in this proceeding was sponsored by PGW's expert witness, Constance Heppenstall, a Senior Rate Studies Project Manager at Gannett Fleming Valuation and Rate Consultants, LLC. Heppenstall used the Average and Excess Demand (AED) Method to assign distribution system costs to the various classes. The AED method is a demand-related cost allocation method. First, the costs are functionalized into categories (production, storage, transmission, distribution, and other functions). The next step is to identify the primary causative factor. This is called classification. Costs are classified as commodity-related (production plant expenses), **capacity-related** (costs which are associated with **meeting the peak demands of the system** including **distribution expenses)**, and

---

[7] Although the OCA disagreed with other aspects of PGW's CCOSS, it agreed with the manner in which PGW allocated the costs to the Rate IT class.

[8] The limited issues presented in this appeal regarding PGW's CCOSS are just a few of the many that were presented by PGW and other parties to the Commission's proceedings, as demonstrated by the Commission's 269-page decision.

customer-related (costs related to meters, service laterals, regulators, customer service, meter reading and billing). (R.R. at 18a, 165a.) The AED method allocates the costs to the various customer classes. *Id.* at 165a. This is accomplished by developing allocation factors that reflect the percentage of the total cost that should be paid by each class. The allocation factors should reflect cost-causation; that is, the degree to which each class **caused** the utility to incur the cost. *Id.* at 166a. Further, each customer class should be comprised of customers having similar characteristics. *Id.* Allocating costs to homogeneous customer classes ensures that the rates derived from a class cost-of-service study are just and reasonable and reflect the actual cost to serve. *Id.*

With respect to distribution mains, compression station, and general measuring and regulating equipment (*i.e.*, fixed costs), **Heppenstall treated Rate IT customers the same as Firm service customers in that her "excess" demands reflected interruptible peak day demands as if they were Firm service customers**. She explained:

> Distribution costs are allocated based on the type of cost. . . Costs related to distribution . . . are allocated volumetrically based on . . . the average and excess capacity for each classification. The weighting of the factors was based on precedence of 50% allocated on average daily usage and 50% allocated to excess above average daily usage. . . . **The Interruptible [Rate IT] customer class average and excess usage is included in the calculation <u>as these customers have only been interrupted once (in 2004) in almost 20 years and cannot be truly considered as interruptible for cost allocation purposes.</u>**

*Id.* at 7a-8a (emphasis and double emphasis added).

Heppenstall explained that although **PGW does not include interruptible load in calculating its peak design day demand**, PGW does provide gas during the period of Rate IT peak day demand. Therefore, the cost allocation

9

should reflect that service. Heppenstall reasoned that Rate IT customers have been receiving the equivalent of Firm service for approximately 20 years during periods of excess demand on the system even though they are subject to the possibility of interruption. Heppenstall concluded that the Rate IT class has not been paying a rate that reflects the service it has been receiving. She opined that for cost allocation purposes, the peak-related distribution mains costs that are allocated to Firm service customers, should also be allocated to interruptible customers, which have essentially been receiving Firm service.

In response, Petitioner disputed PGW's classification of Rate IT as being Firm for purposes of cost allocation. Specifically, it was Petitioner's position that **interruptible customers should not be assigned any distribution mains-related costs since natural gas distribution companies do not plan or size their distribution mains to meet interruptible loads**. Billie LaConte, an energy advisor and Associate Consultant at J. Pollock, Inc., testified on Petitioner's behalf. LaConte took issue with PGW's proposal to use the same methodology to allocate delivery costs to Rate IT customers as it uses to allocate delivery costs to gas sales customers that receive Firm delivery service. She testified that **PGW's application of the AED method failed to recognize the interruptible nature of the gas delivery service provided to Rate IT customers and inappropriately treats Rate IT as Firm delivery service**. *Id.* at 120a. According to LaConte, PGW improperly classified Rate IT customers as Firm service customers in its CCOSS due to the infrequency of curtailments. **Infrequency of curtailments,** explained LaConte, **does not relieve Rate IT customers from having to invest in systems to allow for interruptions in the event that PGW does call for a curtailment**. In other words, infrequency of curtailments **does not mean that Rate IT customers are receiving Firm service as**

10

**Rate IT customers** are specifically required to have the ability to curtail their systems. *Id.* LaConte also pointed out the **inconsistency** in PGW's position that it does not include interruptible load in its Peak <u>Design</u> Day Demand because it would increase the design day demand on PGW's gas distribution system – while using Peak <u>Day</u> Demand to allocate distribution main costs and treating Rate IT service as Firm service. *Id.* at 126a. She reasoned that **"[i]f interruptible load is not included in Peak Design Day Demand, then interruptible load should not be treated as [F]irm load**, because [F]irm load **is** included in Peak Design Day Demand." *Id.* at 127a (emphasis in original). LaConte concluded that peak-related costs should not be allocated to the Rate IT class because **Rate IT does not contribute to peak events** and recommended that PGW be instructed to re-set its "extra demand" to zero. *Id.* at 130a. LaConte prepared a revised CCOSS in which she concluded that Rate IT is already substantially above its allocated cost of service. *Id.* at 146a.

Based on the foregoing, Petitioner argued, *inter alia*, that PGW's CCOSS must be modified to recognize that Rate IT customers remain subject to interruption at any time. Petitioner asserted that, **contrary to causation principles**, PGW's CCOSS treats Rate IT customers as Firm service customers, while requiring such customers to perform as interruptible for purposes of receiving service, resulting in discrimination against Rate IT customers.

### 2. ALJ's Recommendation

On September 5, 2023, the ALJs issued a Recommended Decision recommending that PGW's proposed revenue increase of $85.8 million be denied because PGW did not meet its burden of proving by a preponderance of the evidence the justness and reasonableness of every element of its requested increase. Instead, the ALJs recommended the approval of an increase in annual operating revenue in the

11

amount of $22.3 million. Regarding certain inputs to PGW's revenues and expenses, the ALJs found, among many other issues not germane here, that because PGW has not interrupted Rate IT since 2004, Rate IT customers should be deemed "Firm" service customers for purposes of PGW's CCOSS.[9] The ALJs therefore recommended that the Commission approve PGW's AED method for the allocation of distribution main costs.

### 3. Petitioner's Exceptions

On September 15, 2023, Petitioner, along with PGW and several other parties, filed multiple exceptions to the ALJs' Recommended Decision. For its part, Petitioner took issue with the ALJs' recommendation that the Commission adopt PGW's CCOSS methodology, in particular, PGW's use of the AED method and its treatment of Rate IT customers as Firm for the purposes of the CCOSS and interruptible for purposes of PGW's Tariff. Petitioner questioned the ALJs' reliance on PGW's position that Rate IT is only "technically" interruptible, arguing that PGW **requires** Rate IT customers to remain interruptible. Petitioner argued that, **contrary to cost causation principles**, PGW's CCOSS **treats Rate IT customers as Firm service** customers while requiring Rate IT customers to perform as interruptible for purposes of receiving service. Petitioner also argued that the allocation of excess demand to

---

[9] The CCOSS is just one of many factors that are considered when assessing PGW's cash flow needs and revenue requirements. Again, we cannot stress enough that the Commission's order addressed numerous exceptions by numerous parties, including PGW, and that the issues raised here by Petitioner represent a single aspect of the Commission's overall order. For example, PGW filed exceptions to the ALJs' recommendations regarding its revenue requirements including debt service coverage ratio, days cash on hand, year-end cash balance, debt to total capitalization ratio, expenses including costs if customer information systems, payroll expenses and taxes, lobbying expenses, rate case expenses, COVID-19 related expenses, advertising expenses, pension expense, other post-employment benefits, normalization of expenses for gas processing, field operations, collection, customer service, account management, marketing, and administrative and general expenses, and inflation adjustment. Other parties filed exceptions to the ALJs' recommendations regarding, *inter alia*, PGW's incentive compensation plan expense, construction expenditures, depreciation balance, and uncollectible balance reserves.

Rate IT customers is inappropriate because, pursuant to PGW's Tariff, such customers are truly interruptible when they meet certain requirements for service and, in return, **PGW has the right to interrupt their service** for reliability purposes. Petitioner added that **PGW has no obligation to serve interruptible customers**. In short, Petitioner argued that interruptible customers are interruptible because they are subject to interruption, **regardless of whether or how often an interruption takes place**. Further, Petitioner contended that PGW's proposed CCOSS discriminates against Rate IT customers because it adopts a value-of-service cost allocation, thereby violating cost-of-service principles. Accordingly, Petitioner argued that PGW's proposed CCOSS must be modified to remove the allocation of peak-related excess demand costs from the Rate IT class.

### 4. The Commission's Decision

On November 9, 2023, the Commission entered an order approving an overall revenue increase of $26.2 million. Among other things, the Commission agreed with the ALJs' recommendation to approve PGW's proposed CCOSS, thereby treating Rate IT customers as Firm for purposes of rate making. The Commission agreed with the ALJs that, "for cost allocation purposes, interruptible customers are not truly interruptible." (PUC Decision at 137.) The Commission determined that because Rate IT customers receive the equivalent of Firm service (by using PGW's distribution system during peak periods), the costs incurred to provide peak demand should be allocated to Rate IT customers in the same manner they are to Firm service customers, and that Rate IT customers are substantially underpaying their costs to serve. That is, it treated interruptible customers the same as Firm service customers, in that excess demands reflect interruptible peak day demands as if they were Firm service customers.

13

The Commission also approved PGW's Tariff without making any changes to the service provided by PGW to Rate IT customers.

On February 14, 2024, Petitioner petitioned for review of the Commission's January 18, 2024 order. On February 23, 2024, the OCA filed a Notice of Intervention in this Court. On March 13, 2024, PGW filed a Notice of Intervention.

## II. Questions Presented

Petitioner raises three issues. **First**, it argues that by creating an arbitrary and capricious hybrid classification for Rate IT customers, the Commission unreasonably differentiated Rate IT customers from PGW customers on other rate schedules. According to Petitioner, the result of the Commission's order is that Rate IT customers must pay a premium price for Firm service, yet still maintain, at their own expense, necessary equipment and processes to allow them to be interrupted at PGW's discretion or be subject to penalties if they fail to comply with PGW's interruption. **Second**, Petitioner argues that by determining that cost causation principles used to determine rates need not align with the service provided to a customer class, the Commission's decision ignores bedrock principles of ratemaking and disregards this Court's precedent. **Third**, Petitioner argues that subjecting Rate IT customers to interruptible service while forcing them to pay rates as if they are receiving Firm service is unjust and unreasonable.

## III. Analysis

Our review of an order of the Commission is limited to determining whether the Commission violated constitutional rights, erred as a matter of law or procedure, or made findings unsupported by substantial evidence in the record. 2 Pa. C.S. § 704; *Popowsky v. Pennsylvania Public Utility Commission*, 910 A.2d 38, 48 (Pa. 2006). In conducting such review, we defer to the Commission's interpretation of both

14

the Code and its own regulations unless such interpretation is clearly erroneous. *Popowsky v. Pennsylvania Public Utility Commission*, 706 A.2d 1197, 1203 (Pa. 1997). We will "neither substitute [our] judgment for that of the [Commission] when substantial evidence supports the [Commission]'s decision on a matter within the [Commission]'s expertise, nor should [we] indulge in the process of weighing evidence and resolving conflicting testimony." *Lehigh Valley Transportation Services, Inc. v. Pennsylvania Public Utility Commission*, 56 A.3d 49, 56 (Pa. Cmwlth. 2012) (internal quotations, original bracketing, and citation omitted).

A public utility is entitled to an opportunity to earn a fair rate of return on the value of the property dedicated to public service. *Pennsylvania Gas and Water Co. v. Pennsylvania Public Utility Commission*, 341 A.2d 239, 251 (Pa. Cmwlth. 1975) (citations omitted). Section 1301(a) of the Code mandates that "[e]very rate made, demanded, or received by any public utility . . . shall be just and reasonable, and in conformity with [the] regulations or orders of the [C]ommission." 66 Pa.C.S. § 1301(a). Pursuant to the just and reasonable standard, a utility may obtain "a rate that allows it to recover those expenses that are reasonably necessary to provide service to its customers[,] as well as a reasonable rate of return on its investment." *City of Lancaster Sewer Fund v. Pennsylvania Public Utility Commission*, 793 A.2d 978, 982 (Pa. Cmwlth. 2002). There is no single way to arrive at just and reasonable rates, and "[t]he [Commission] has broad discretion in determining whether rates are reasonable" and "is vested with discretion to decide what factors it will consider in setting or evaluating a utility's rates." *Popowsky v. Pennsylvania Public Utility Commission*, 683 A.2d 958, 961 (Pa. Cmwlth. 1996).

The burden of proof to establish the justness and reasonableness of every element of a public utility's rate increase request rests solely upon the public utility in

all proceedings filed under Section 1308(d) of the Code. 66 Pa.C.S. § 315(a); *see also Lower Frederick Township Water Co. v. Pennsylvania Public Utility Commission*, 409 A.2d 505, 507 (Pa. Cmwlth. 1980); *Brockway Glass Co. v. Pennsylvania Public Utility Commission*, 437 A.2d 1067 (Pa. Cmwlth. 1981). Section 315(a) of the Code provides as follows:

> **Reasonableness of rates.** -- In any proceeding upon the motion of the [C]ommission, involving any proposed or existing rate of any public utility, or in any proceedings upon complaint involving any proposed increase in rates, the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility.

66 Pa.C.S. § 315(a).

Under Section 1303 of the Code, no public utility shall "directly or indirectly, by any device whatsoever, or in anywise, demand or receive from any person, corporation, or municipal corporation a greater or less rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto." 66 Pa.C.S. § 1303. Moreover, Section 1304 of the Code (Discrimination in Rates) provides that "[n]o public utility shall establish or maintain any unreasonable difference as to rates . . . as between classes of service."

**1.**

**A. Is There an Unreasonable Difference in Rates Between Firm and Interruptible Customers – Considering the Extra Costs Interruptible Customers Must Bear?**

Petitioner first argues that a classification of Rate IT customers that forces such customers to pay for Firm service but maintain the ability to interrupt at PGW's sole discretion per the terms of its Tariff and comply with the mandatory requirements for interruption, is arbitrary and capricious and unreasonably discriminates against Rate IT customers. It contends that this approach is in direct violation of Section 1304 of the Code, which does not allow for "unreasonable differentiation" among classes of

16

service. It alleges that the CCOSS accepted by the Commission treats the Rate IT class as receiving Firm service for purposes of cost allocation, while at the same time requires that class to maintain facilities necessary to maintain their operations in the event that PGW interrupts their service, in accord with PGW's Tariff. (Petitioner's Br. at 31-35.) Petitioner argues that Rate IT customers must maintain these facilities and stand at the ready to be interrupted, which creates added expense for these customers that Firm service customers do not have to bear. This inequity, according to Petitioner, is an "unreasonable difference in rates" that must either be corrected by revising the allocation of costs to Rate IT or by remanding this matter to the Commission in order to revise PGW's Tariff to provide Firm service to this class.

This Court has provided the following as to discrimination in rates under 66 Pa.C.S. § 1304:

> It must first be noted that not all differences in rates are discriminatory and, therefore, unlawful. Only unreasonable differences are prohibited. More importantly:
>
>> Before a rate can be declared unduly preferential and therefore unlawful, it is essential that there be not only an advantage to one, but a resulting injury to another. Such an injury may arise from collecting from one more than a reasonable rate to him in order to make up for inadequate rates charged to another, or because of a lower rate to one of two patrons who are competitors in business. There must be an advantage to one at the expense of the other.

*Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 470 A.2d 654, 657 (Pa. Cmwlth. 1984) (citing *Alpha Portland Cement Co. v. Public Service Commission*, 84 Pa. Super. 255 (1925)).

17

There is no disagreement that Rate IT service and Firm service constitute two different reasonable classes of services and, as such, are allowed by Section 1304 of the Code. However, for such a rate differential to survive a discriminatory rate challenge brought under Section 1304 of the Code, 66 Pa.C.S. § 1304, it must be shown that the differential can be justified. *Lloyd*, 904 A.2d at 1020 (rejecting "gradualism" as justification for the difference in rates between commercial and residential customers). Moreover, "the rates for one class of service shall not be unreasonably prejudicial and disadvantageous to any other class of service." *Pennsylvania Retailers' Associations v. Pennsylvania Public Utility Commission*, 440 A.2d 1267, 1271 (Pa. Cmwlth. 1982); *Zucker v. Pennsylvania Public Utility Commission*, 401 A.2d 1377, 1382 (Pa. Cmwlth. 1979).

Here, the Commission offered no explanation for the incongruent treatment of Rate IT customers as Firm for purposes of rate setting but interruptible for purposes of conditions of service under PGW's Tariff. Although this Court affords considerable deference to the Commission in matters within its expertise, we find the Commission's lack of explanation in this regard insufficient to justify treating Rate IT customers as receiving non-interruptible service. Our concern, which we find is **not adequately addressed by the Commission, is that Rate IT customers do not receive Firm service under PGW's Tariff**. A customer's status as interruptible is defined by PGW's discretionary **right to interrupt**, rather than the **actual frequency** of interruptions. Rate IT customers are interruptible because they are subject to interruption, regardless of whether or not they are actually interrupted. The argument that interruptions have been limited overlooks the key determinant of the lower quality of Rate IT service, which is PGW's ability to interrupt at any time, not the frequency, timing, or duration of actual interruptions. It also ignores that Rate IT customers must

18

establish and maintain alternative sources of energy at their own expense.  **A customer is either subject to interruption or not, and such interruption is PGW's discretionary right; it is this discretionary right to interrupt, rather than the actual frequency of interruptions, that defines a customer's status as interruptible**.  Specifically, Rate IT effectively ensures that PGW can deliver uninterrupted (*i.e.*, Firm) gas to its sales customers during a peak event by allowing PGW to interrupt Rate IT service during such an event.  Under its **Tariff**, PGW has **no obligation to serve Rate IT customers** the load during periods of system curtailment or transmission constraints such as during cold weather or emergency events.

Rate IT customers are **required, at their own expense,** to install special equipment and maintain the ability to curtail or interrupt usage upon just eight hours' notice.  For example, Vicinity Energy Philadelphia, Inc., a Rate IT customer, has installed oil storage and can operate for 20 days in the winter using oil stored on site.  (R.R. at 331a.)  No other PGW rate class is obligated to make such expenditures or meet these alternative source of energy requirements.  Unlike Rate IT customers, Firm service customers are not subject to these stringent requirements to remain eligible for non-interruptible service.  Therefore, there is at least a question of whether, by charging Rate IT customers the same rates as Firm service customers, while at the same time requiring them to comply with their Tariff requirements, is just and reasonable.  **However, the Commission has not addressed the uniqueness of Rate IT customers in any meaningful way**.  The Commission basically held that because Rate IT customers have not been interrupted in the past 20 years, they should share in the fixed costs PGW incurred years ago in creating its distribution system, which was designed to meet the demands of non-interruptible customers.

**a) Sufficiency of the Commission's Adjudication**

Section 703(e) of the Code provides in relevant part:

> After the conclusion of the hearing, the commission shall make and file its findings and order with its opinion, if any. Its findings shall be in sufficient detail to enable the court on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence.

66 Pa.C.S. § 703(e). This provision has been held to serve as explicit authorization for returning a matter to the Commission where the adjudication subject to review is insufficiently detailed to permit the reviewing court to assess the sufficiency of the evidence in support of the Commission findings and to evaluate the Commission's resolution of the controverted legal issues. *Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission*, 642 A.2d 541, 544 (Pa. Cmwlth. 1994). Here, the Commission did not meet that standard. Without some discussion or at least some acknowledgement that Rate IT customers are subject to additional financial burdens, we are unable to fully perform our judicial review. *See Metropolitan Edison Co. v. Pennsylvania Public Utility Commission*, 22 A.3d 353, 374 (Pa. Cmwlth. 2011) (remanding to the Commission for it to provide analysis and explanation for its determination regarding whether utility companies should be permitted to recover carrying charges based on unwound generation contracts); *National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission*, 677 A.2d 861, 864-65 (Pa. Cmwlth. 1996) (holding that the Commission's failure to provide any analysis to support its decision on a particular issue or a sufficient explanation for changing its position from a prior, factually similar situation prevented this Court from performing judicial review).

**B. Hybrid Classification - Can Petitioner be Treated as Firm for Ratemaking Purposes, but Interruptible for Purposes of the Terms and Conditions of Service provided under PGW's Tariff?**

Moreover, the Commission provided no reasoning or justification for creating what appears to be a **hybrid classification** that treats Rate IT as "effectively [F]irm" for ratemaking purposes but interruptible for purposes of the terms and conditions of service provided under PGW's Tariff. A tariff is a set of operating rules imposed by the State that a public utility must follow if it wishes to provide services to customers. It is a public document which sets forth the schedule of rates and services and rules, regulations and practices regarding those services. It is well settled that public utility tariffs must be applied consistently with their language. 66 Pa.C.S. § 1303. Public utility tariffs have the force and effect of law, and are binding on the customer as well as the utility. *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission*, 663 A.2d 281, 284 (Pa. Cmwlth. 1995). In creating a hybrid classification to treat Petitioner as Firm, we agree with Petitioner that this appears to violate PGW's Tariff and thus Section 1303 of the Code. Certainly, if an interruption was to occur, for instance, the Rate IT customer could not claim that it is being treated as a Firm service customer, and refuse to cut its usage. Rate IT service remains, pursuant to the terms of PGW's Tariff, unequivocally interruptible. The Commission's decision to assign Rate IT a rate increase based upon Firm service while PGW continues to reserve all rights to interrupt Rate IT customers creates, without any acknowledgement of the exceptionality of the situation, a new category of "hybrid" ratemaking that does not exist under any caselaw or regulations. Without having a more detailed discussion regarding the basis upon which the Tariff would permit the Commission to conclude that Petitioner can be treated as interruptible for one purpose but not the other, we are

21

unable to conduct meaningful appellate review. Accordingly, we must remand to the Commission for further explanation or clarification regarding this inconsistency.

**2.**

## A. Were Cost Causation Principles Ignored?

Next, Petitioner argues that the Commission's approval of PGW's treatment of Rate IT customers' demand load as Firm in its CCOSS ignores cost causation principles.

The principles of cost causation require that the cost of supplying public utility services be **allocated to those who cause the costs to be incurred**. *See Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 588-89 (1945); *KN Energy, Inc. v. Federal Energy Regulatory Commission*, 968 F.2d 1295, 1300-01 (D.C. Cir. 1992) (parties may not be responsible for costs that they could not have caused). Stated differently, the rates charged to customers for service should align with the costs incurred by the utility to provide corresponding service to those customers. Cost-based ratemaking is the "polestar" of the rate setting process. *Lloyd*, 904 A.2d at 1019. Yet here, we see no determination in the record as to how Petitioner "caused the costs to be incurred."

Moreover, we are unaware of any litigated rate case where the Commission treated Rate IT customers as Firm service customers. And, we have found no Pennsylvania cases that have considered the issue presented here, which is whether distribution costs may be allocated to interruptible customers without establishing how Petitioner caused the costs to be incurred if PGW, at any time, can direct interruption of these customers at its sole discretion during peak periods.

However, other jurisdictions have considered the issue and have held that where the utility **can** control capacity and distribution costs by curtailing service to

22

interruptible customers, then it is **inconsistent with cost causation principles** to include interruptible load in the excess demand allocation factor. For example, the Federal Energy Regulatory Commission (FERC) considered the principle of cost causation in *Kentucky Utilities Co.*, 15 F.E.R.C. ¶ 61,002 (1981), and held that **the ability to interrupt service to a customer prevents the imposition of peak demand costs**. In *Kentucky Utilities*, a rate increase case, FERC refused to impose demand costs on interruptible customers, holding that the **utility could not allocate capacity costs to non-firm transmission service** since such service did not factor into the utility's capacity decisions. There, FERC reversed the ALJ on the questions of whether a portion of the capacity costs of the Kentucky Utilities Company's (Kentucky) transmission system should be allocated to the City of Paris, Kentucky (Paris), and the proper rate of return.

Also, like the facts presented here, Kentucky had the right to interrupt or curtail the delivery of energy to Paris. Kentucky argued that because it was obligated to use its transmission system for most of the year in serving Paris, that city, like the other wholesale customers, should pay for a portion of Kentucky's transmission system. In developing the rate for energy Kentucky allocated transmission capacity costs to Paris. The costs were allocated in proportion to Paris's contribution to the average of the system's peaks during each month of the year. This was the same method Kentucky used in allocating transmission capacity costs to the other wholesale customers. Similar to the Commission's reasoning here, the ALJ held that it would be basically unfair for Paris to make substantial use of the transmission lines and not to pay a share of the cost burden Kentucky has in relation to those lines. Reversing, FERC explained that

> [t]he allocation method Kentucky has used here is one form of the peak responsibility method of allocating demand costs.

This method allocates capacity costs according to the customers' responsibility for the costs incurred. **The theory is that the utility must build bulk power facilities, *i.e.*, generating units and transmission lines, in large part to meet the maximum or peak anticipated demands of its customers. Because the utility incurs the costs of these facilities to meet peak demand, the theory holds that the customers who will impose demands on the system at the system's peak should pay for the facilities.** The peak responsibility method accomplishes this by allocating the cost of the facilities among the customers in the same proportion each customer's demand bears to the system's peak.

Under this method capacity costs are properly allocable to the other wholesale customers. Essentially, Kentucky provides these customers with firm power service. The customers can call upon Kentucky to deliver energy whenever and at whatever rate they desire. Kentucky is obligated to satisfy these requests. **Because these customers may desire energy at the system peak, Kentucky must consider their demands in planning its bulk power facilities. The secondary energy service Kentucky provides Paris, however, is fundamentally different. Kentucky has the right to interrupt or curtail the delivery of secondary energy**. True, this right is not unlimited. Periods of curtailment or interruption may not aggregate more than 400 hours in any 12 consecutive months or 1000 hours in any five consecutive years. But even this limited period appears to be more than enough to allow Kentucky not to serve Paris during the system's peak periods. **Kentucky recognized this when it negotiated the agreement with Paris and specifically bargained for the right to interrupt for this period. Kentucky has exercised this right. <u>Although Kentucky has not interrupted service to Paris during every peak period, this is irrelevant to the application of the peak responsibility method</u>. <u>What is important is that because of the right to interrupt, Kentucky can keep Paris from imposing any demand on Kentucky's system during peak periods and thereby</u>**

24

**control its capacity costs**. In these circumstances the peak responsibility method provides that no demand costs whatsoever are to be allocated to the customer. And we have so held.

\* \* \* \*

**Moreover, there is no evidence in the record showing that Paris has caused Kentucky to build any transmission facilities**.

*Id.* at 61003-04 (footnotes omitted) (emphasis and double emphasis added). *See also Louisiana Public Service Commission v. Federal Energy Regulatory Commission*, 482 F.3d 510 (D.C. Cir. 2007) (it was **unjust or unreasonable** for utility to include interruptible load in its calculation of peak load **responsibility** because **utility** could **control capacity costs by curtailing interruptible service** during times of peak demand and that the cost of providing interruptible service is, by definition, avoidable and not an expense that justifies an increase in capacity); *Delmarva Power & Light Co.*, 24 F.E.R.C. ¶ 61,199, 61,462 (1983) (following *Kentucky Utilities*); *Orange & Rockland Utilities, Inc. v. Federal Energy Regulatory Commission*, 905 F.2d 425, 428 (D.C. Cir. 1990) (If peak-period use determines the size of gas transmission facilities . . . then it is not clear why interruptible service—at least if it is genuinely interruptible— should bear any portion of the fixed costs).

Instantly, and similar to the above cases, PGW also had the right by agreement to, at its discretion, interrupt service to Petitioner during periods of peak demand. The salient question then is whether PGW should have used the AED method to allocate to Rate IT customers the costs incurred to provide peak usage (excess demand), when those customers, by their nature, only demand Rate IT service. Relevant to this inquiry we believe is whether, if PGW can control its capacity and distribution costs by interrupting Petitioner, Petitioner is impacting PGW's peak demand, and, whether allocating peak-demand related costs to the Rate IT class on a

historic basis, is in accordance with cost causation principles. The Commission answered these questions in the affirmative.

Applying the rational of *Kentucky Utilities*, whether PGW interrupts every 20 years or every 20 days, the fact remains that at any time, PGW can keep Petitioner from imposing any demand on the system during peak periods by interrupting service **and control its capacity and distribution costs**.

Moreover, it is not at all clear that the Rate IT class is appropriate or qualifies for cost allocation between the Firm service class because the classes are not homogenous. Again, for purposes of revenue allocation and rate design, customers are supposed to be grouped into homogenous classes according to their usage patterns and service characteristics. Rate IT is a completely different or distinct class of customers than Firm service. Accordingly, as we just pointed out, PGW must serve its distinct customer classes under different rate schedules that must reflect the service each class elects.

Unfortunately, the Commission's explanation that Rate IT is not "truly interruptible" is insufficient to explain why Rate IT customers are being treated as Firm service customers for purposes of cost allocation when they are not guaranteed deliveries on peak demand days and which PGW need not serve at its peak. As noted, in this case, we are concerned with PGW's natural gas distribution costs (*e.g.*, distribution mains, compression station, and general measuring and regulating equipment), which are demand-driven fixed costs. Under cost causation principles, the inquiry is "who causes or influences" those costs.

It is unclear from the record and the Commission's decision that PGW successfully demonstrated how serving non-interruptible customers during peak demands directly **caused** PGW to incur those fixed costs. Natural gas distribution

companies do not plan or size their distribution mains to meet interruptible loads – they plan them to meet non-interruptible loads, *i.e.*, the customers for whom they were constructed. Therefore, we are unable to conclude from this record or the Commission's decision that interruptible service directly caused or influenced PGW's fixed demand-driven distribution costs. Neither PGW's expert nor the Commission adequately explained how interruptible customers caused or influenced these fixed costs. Rather, it seems to the Court that the PGW's expert and the Commission applied a **retrospective benefits or "value of service" principle** - and concluded that **customers should pay for the benefits that they ultimately received** from a utility service, such as the reliability, quality, or environmental attributes. Therefore, the costs of such benefits may rightly be assessed to those customers **in hindsight**.

However, neither the PGW nor the Commission cites any case where our courts have used a retrospective benefits principle in a cost allocation analysis. We question whether PGW's reliance on historical interruptions is consistent with the notion that the cost causation principle is a "forward-looking principle" that allocates to future beneficiaries their share of the costs. *See Louisiana Public Service Commission v. Federal Energy Regulatory Commission*, 184 F.3d 892, 896 (D.C. Cir. 1999). We also find insufficient evidence to demonstrate that Rate IT customers **caused** PGW to incur the costs of constructing its distribution system. By its own admission, PGW builds its system to meet design day demand, and purposefully does not include interruptible load in its design day demand. To that end, PGW admitted that interruptible load is properly excluded from its calculation of excess demand (costs incurred by PGW to meet peak day requirements). When asked about the recognition of interruptible customers, PGW stated that if "a customer's flow is truly interruptible, the customer would not be allocated excess demand capacity in the allocation of costs

related to distribution mains." (R.R. at 130a, 159a.) As we have just explained, Rate IT customers **are** truly interruptible regardless of the **historic frequency** of interruptions.

Moreover, the Rate IT class is a Commission-approved rate class with prescribed qualifying conditions. PGW entered into contracts with these customers which agree, in exchange for being interruptible, to pay a certain rate for inferior service. Rate IT customers are also required to incur costs for installing equipment that is capable of displacing the daily quantity of gas subject to curtailment, or the ability to manage the business without the use of gas during curtailment periods. Making them responsible for costs to provide Firm service because historically they have not been interrupted would change the basic agreement and one must wonder (from a basic fairness perspective) if those customers would have agreed to Rate IT service (and the burdens associated therewith) if they knew they would be allocated costs incurred by PGW to provide Firm service.

We are unconvinced at this juncture, **without a more reasoned explanation**, that this logic is necessarily **consistent with, or an extension of, cost causation principles**, or if it is, rather, **a new ratemaking principle** that should supplement or replace cost-causation as the operative ratemaking rationale in this extraordinary situation. Because the Commission appears to have deviated from its and this Court's prior precedent, *Lloyd* (under cost causation principles, energy rates must reflect to some degree the costs **actually caused by** the customer class), by adopting a retrospective benefits principle, it is important that it fully explain why this does not conflict with the cost causation principles. The Commission is required to provide a fully reasoned analysis as to why it deviated from the standard norm. Such reasoned analysis is absent here. Relatedly, it is **unclear** that employing a **benefits**

28

**principle** can be squared with the Commission's responsibility to impose only "**just and reasonable**" rates in light of the mandatory costs incurred by Rate IT customers in having to secure and maintain alternative energy sources. Because the Commission has failed to provide a clear path from the facts and considerations before it to the decision it reached, we must conclude that what appears to be a suggestion of a new retrospective (backwards-looking) benefits rationale does not satisfy the basic requirements of reasoned decision making. Thus, we are compelled to remand for further explanation and fact finding on this issue.

## IV. Conclusion

For the foregoing reasons, the order of the Commission is vacated, and the matter is remanded to the Commission for further explanation and clarification regarding:

1. Whether treating Petitioner as technically "Firm" for purposes of **rate allocation** while, at the same time, requiring it to adhere to the obligations of **interruptible** customers under PGW's Tariff violates PGW's Tariff and, thus, Section 1303 of the PUC Code;

2. How, under a cost causation analysis, Rate IT customers **caused** PGW's distribution mains-related costs to be incurred;

3. Whether the Commission applied a **new retrospective benefits or "value of service" principle** to conclude that interruptible customers should pay for the benefits that they ultimately received from a utility service for purposes of rate allocation, and if so, whether that principle is consistent with cost causation principles or whether it is a new ratemaking principle that should replace or

29

supplement cost-causation as the operative ratemaking rationale in this unique situation; and

4. **Whether** employing a **benefits principle** can be squared with the Commission's duty to impose only "**just and reasonable**" rates considering the interruptible nature of Rate IT customers and their investment in systems to allow for interruptions in the event that PGW does call for a curtailment.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Philadelphia Industrial and Commercial Gas Users Group,<br>Petitioner | : <br> : <br> : <br> : | |
| v. | : <br> : | No. 128 C.D. 2024 |
| Pennsylvania Public Utility Commission,<br>Respondent | : <br> : <br> : <br> : | |

## *ORDER*

AND NOW, this 1st day of August, 2025, the January 18, 2024 order of the Pennsylvania Public Utility Commission (Commission) is hereby **VACATED,** and the matter is **REMANDED** to the Commission for further explanation and clarification regarding:

1. Whether treating Philadelphia Industrial Commercial Gas Users Group as technically "Firm" for purposes of **rate allocation** while, at the same time, requiring it to adhere to the obligations of **interruptible** customers under Philadelphia Gas Work's (PGW) Tariff violates PGW's Tariff and, thus, Section 1303 of the PUC Code;

2. How, under a cost causation analysis, Rate IT customers **caused** PGW's distribution mains-related costs to be incurred;

3. Whether the Commission applied a new retrospective benefits or "value of service" principle to conclude that interruptible customers should pay for the benefits that they ultimately received from a utility service for purposes of rate allocation, and

if so, whether that principle is consistent with cost causation principles or whether it is a new ratemaking principle that should replace or supplement cost causation as the operative ratemaking rationale in this unique situation, and

4. Whether employing a benefits principle can be squared with the Commission's duty to impose only "just and reasonable" rates considering the interruptible nature of rate IT customers and their investment in systems to allow for interruptions in the event that PGW does call for a curtailment.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Philadelphia Industrial and : 
Commonwealth Gas Users Group, : 
                Petitioner : 
          : 
        v. : No. 128 C.D. 2024
          : ARGUED:  December 9, 2024
Pennsylvania Public Utility : 
Commission, : 
            Respondent : 


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MATTHEW S. WOLF, Judge
              HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**DISSENTING OPINION BY**
**SENIOR JUDGE LEADBETTER**              **FILED:  August 1, 2025**

       While I do not find a remand to the Pennsylvania Public Utility Commission (PUC) for further explanation of its order particularly objectionable, I do not believe it is necessary and, therefore, I respectfully dissent.  The PUC's 269-page opinion is thorough and clearly explains the bases for its decision, which I find to be reasonable and entitled to deference.

       Although there were many different issues involved in the adjudication of exceptions by different parties to Philadelphia Gas Works' (PGW) proposed rate increase, this appeal involves the challenge of Petitioner, Philadelphia Industrial and Commercial Gas Users Group (PICGUG), to the treatment of the interruptible (IT) customer rate class in PGW's Allocated Class Cost of Service Study (ACCOSS). As noted by the PUC:

An ACCOSS is a benchmark for evaluating customer class cost responsibility with the fundamental purpose of aiding in the accurate and reasonable design of rates by identifying all the capital and operating costs incurred by the utility in serving its customers, and then directly assigning or allocating these costs to each individual rate class based on established principles of cost-causation.

Reproduced Record (R.R.) at 708a.

In this study, PGW relied on actual costs incurred in servicing these customers, both for their average daily usage and excess above average daily usage. Petitioner contends that for cost of service study purposes, PGW should calculate these customers' excess usage as zero because PGW has the right to interrupt their service at peak times, even though it has not done so in twenty years.[1] In other words, these customers should be allowed to get the benefit of service but not have that benefit reflected in their rates, i.e., to have their cake and eat it too. However, as the PUC explained:

> To the extent that PICGUG challenges PGW's treatment of the interruptible/Rate IT customer class through its proposed ACCOSS, we agree with the A[dministrative Law Judge]s that for cost allocation purposes, interruptible customers are not truly interruptible. Further, we find the testimony of the [Office of Consumer Advocate]'s witness, Mr. Watkins, more persuasive. Specifically, Mr. Watkins testified that PICGUG's position that interruptible customers should not be responsible for peak demand associated with distribution mains will result in a significant under-assignment of cost responsibility to interruptible customers. Mr. Watkins also testified and provided evidence supporting that interruptible customers rely on the Company's distribution system every day and have not been interrupted for nearly twenty years. Moreover, based

---

[1] Such an interruption occurred once, in 2004.

2 - BBL

on Mr. Watkins' analysis, including his P&A [(Peak and Average)] study where the interruptible customers include average day demands but the peak component is zero, Rate IT is substantially underpaying its cost to serve. As noted by the O[ffice of Consumer Advocate], because the interruptible class of customers has not been interrupted in nearly twenty years, it is using the Company's distribution system during peak periods. Accordingly, we agree with the O[ffice of Consumer Advocate] that PGW's AED [(Average and Excess Demand)] ACCOSS, where the IT class is treated as receiving firm service, more closely aligns with cost causation.

. . . .

In response to PICGUG's recommendation that the interruptible classes' excess demand be set to zero because interruptible customers are technically interruptible, Ms. Heppenstall explained that the interruptible customer class should be treated the same as firm customers in the cost of service study because their gas supply has not been interrupted for over twenty years. Ms. Heppenstall continued, "[e]ven though PGW does not include interruptible load in calculating its peak design day demand, PGW does provide gas during the period of Interruptible classes' peak day demand. Therefore, the cost allocation should reflect that service." We agree. Accordingly, we find that the Company's proposed AED methodology most closely aligns with the principles of cost causation in this instance.

R.R. at 735a-37a (internal citations omitted).

Moreover, I do not believe the increase to the IT customers is unfair, let alone discriminatory. That class has had a free ride for nearly twenty years and the increase in their rates is modest, yielding rates nowhere near the level of the uninterruptable customers. In this regard, I take issue with the Majority's statement that the PUC's treatment of the interruptible service class in its cost study would

3 - BBL

cause those customers to pay the same rates as firm service customers. As the PUC stated:

> PGW Exhibit CEH-1[] shows the effect on the individual class increases if revenues were brought to each class's full cost of service. As an example, Ms. Heppenstall provided that the IT class would require more than a 160% increase to bring revenues equal to cost of service. By applying the concept of gradualism, PGW opted not to move all classes fully to their cost of service.

R.R. at 709a (internal citation omitted).

Further, as the Office of Consumer Advocate noted, "even with rates that factor in Rate IT's contributions towards peak demand, the rates approved by the PUC and consistent with PGW's [AC]COSS that was accepted for purposes of revenue allocation in this matter, are *substantially less* than other firm customers." OCA's Br. at 15 (citing R.R. at 603a-04a) (emphasis in original).

Thus, I believe the PUC amply justifies its statement that actual usage is properly considered in determining cost causation. As the Office of Consumer Advocate further stated, "Rate IT customers are substantially underpaying their cost of service under any scenario and removing any peak period costs from the Rate IT class for purposes of cost allocation does little to affect the overall result that all other customers are paying substantial amounts to subsidize Rate IT customers." OCA's Br. at 14 (citing R.R. at 191a-94a).

Finally, while I find the PUC's analysis compelling, I also note that in reviewing a question as highly technical as this, it is appropriate to give deference

to the PUC's expertise. *See, e.g.*, *Johnson v. Pa. Pub. Util. Comm'n*, ___ A.3d ___, ___ n.3 (Pa. Cmwlth., No. 192 C.D. 2024, filed April 15, 2025).[2]

**BONNIE BRIGANCE LEADBETTER**
President Judge Emerita

---

[2] Finally, I see no need for further explanations demanded in questions 2 and 3 of the proposed Order. The Majority does not appear to disagree with the use of cost causation analysis. Rather, it seems to suggest that the customer must have had the power to require the service to be provided in order for that service to be considered in such an analysis. I disagree. These customers clearly "caused" the service to be provided when they used the service, notwithstanding the fact that PGW had the unused discretion to refuse it. Further, while PICGUG dubs the PUC's methodology a "value of service" analysis, the PUC clearly explained how its analysis was consistent with cost of causation principles.